EQUAL EMPLOYMENT OPPORTUNI-
TY COMMISSION and Margaret
Hasselman, Plaintiffs,

v.

SAGE REALTY CORPORATION, Monahan Commercial Cleaners, Inc., and Monahan Building Maintenance, Inc., Defendants.

No. 78 Civ. 4607.

United States District Court,
S. D. New York.

Jan. 29, 1981.

---

Leroy T. Jenkins, Jr., Lanier E. Williams, EEOC, Regional Office of Gen. Counsel, Philadelphia, Pa., of counsel, for plaintiff EEOC.

Merrick T. Rossein, Deborah Bachrach, National Employment Law Project, Inc., New York City, of counsel, for plaintiff Margaret Hasselman.

Dublirer, Haydon, Straci & Victor, New York City, for defendant Sage Realty Corp.; Harold Dublirer, Beatrice H. Salten-Smith, New York City, of counsel.

Theodore M. Wolkof, New York City, for defendant Monahan Building Maintenance, Inc.

## ROBERT J. WARD, District Judge.

In this action plaintiffs Equal Employment Opportunity Commission ("EEOC") and Margaret Hasselman allege that defendants Sage Realty Corporation ("Sage"), Monahan Commercial Cleaners, Inc. ("Mon-

ahan Cleaners"), and Monahan Building Maintenance, Inc. ("Monahan Building"), unlawfully discriminated against Hasselman on the basis of sex in violation of Title VII of the Civil Rights Act of 1964 ("the Act"), as amended, 42 U.S.C. §§ 2000e–2000e–17.[1]

After considering the evidence adduced at trial, the Court finds that plaintiffs have established unlawful discrimination by a preponderance of the credible evidence.

Plaintiff Hasselman left the employment of Monahan Cleaners on June 4, 1976. On August 11, 1976, she filed a charge with the EEOC alleging sex discrimination by defendants Sage and Monahan Cleaners, among others.[2] Notice of the charge issued on August 17, 1976. The EEOC investigated the charge and on August 22, 1977, issued a decision finding reasonable cause to believe that Sage and Monahan Cleaners had discriminated against Hasselman with respect to the terms and conditions of her employment and had discharged her because of her sex.

Pursuant to section 706(b) of the Act, 42 U.S.C. § 2000e–5(b), the EEOC, by notice dated August 22, 1977, invited Sage and Monahan Cleaners to participate in settlement discussions in an effort to resolve informally the dispute brought about by Hasselman's sex discrimination charge. Although Sage and Monahan Cleaners both accepted the EEOC's invitation, the settlement negotiations between them and Hasselman did not come to fruition, and by letters dated September 26, 1977, the EEOC notified Sage and Monahan Cleaners that it had determined its effort to conciliate the case had been unsuccessful.

---

**1.** Section 706(f)(3) of the Act, 42 U.S.C. § 2000e–5(f)(3), gives federal district courts subject matter jurisdiction over actions brought pursuant to Title VII. Jurisdiction may also be based on 28 U.S.C. § 1345. Plaintiff EEOC is an agency of the United States authorized by § 706(f)(1), 42 U.S.C. § 2000e–5(f)(1), to bring this action.

**2.** In her charge Hasselman also named the principals of Sage and Monahan Cleaners, a supervisory employee of Sage, and her union,

Local 308, International Brotherhood of Teamsters. Neither Local 308 nor these three individuals are currently named as defendants in this action. Although Local 308 was a named defendant in plaintiff EEOC's initial complaint, EEOC voluntarily dismissed its action against the union on November 27, 1978, pursuant to Fed.R.Civ.P. 41(a)(1). Plaintiff Hasselman did not name Local 308 in either her initial or her first amended complaint.

On October 16, 1978, the EEOC issued to plaintiff Hasselman notices affording her the right to sue Sage and Monahan Cleaners. Shortly thereafter, on October 30, 1978, Hasselman exercised her statutory right under section 706(f)(1) and moved to intervene as a plaintiff in this action, which had already been commenced by the EEOC on September 29, 1978. The Court finds that all of the conditions precedent to the institution of this action required by section 706 have been fulfilled.

Plaintiff Hasselman was employed as a lobby attendant in an office building located at 711 Third Avenue in New York City's Borough of Manhattan from February 1973 until June 4, 1976.[3] At all times relevant to this action Sage managed the building at 711 Third Avenue. Monahan Building, under contract to Sage, currently provides cleaning services at 711 Third Avenue and at other Sage-managed buildings. As part of these services, Monahan Building retains on its payroll the attendants designated by Sage to serve in the lobby of 711 Third Avenue. Hasselman was on the payroll of Monahan Cleaners in 1976 when the acts of sex discrimination at issue here occurred. At that time Monahan Cleaners performed essentially the same services for Sage as Monahan Building performs now. In August 1977 Monahan Building replaced Monahan Cleaners as cleaning contractor for 711 Third Avenue.[4]

Although it continues to exist on paper as a New York corporation, apparently Monahan Cleaners no longer has any assets and is not actively engaged in business. Because Monahan Cleaners did not appear at trial to answer the allegations made against it, at the commencement of trial the Court noted the default of Monahan Cleaners and with respect to this defendant conducted the trial as an inquest.[5] Accordingly, the Court's decision with respect to defendants Sage and Monahan Building also applies to Monahan Cleaners.

In February 1973 Hasselman answered an advertisement in *The New York Times.* She met with Sage's building manager for 711 Third Avenue, Thomas Baxter, who described the duties of the lobby attendant position. Later, on the same day she met

3. The position of lobby attendant has also been referred to by defendants as "lobby hostess." The traditional name for Hasselman's former position at 711 Third Avenue is "elevator starter," and it is the Court's understanding that this is the term used for the position in the collective bargaining agreement by which many of Hasselman's terms of employment were governed.

4. When plaintiff Hasselman was hired by Sage in February 1973, she was placed on the payroll of National Cleaning Contractors (a subsidiary of National Kinney Corporation), where she remained until November 1, 1975, when Monahan Cleaners replaced National as cleaning contractor for certain Sage-managed buildings, including 711 Third Avenue.

5. By decision dated June 6, 1980, *EEOC v. Sage Realty Corp.*, 87 F.R.D. 365, the Court granted plaintiffs' motions to amend their complaints to delete defendant Angelo Palumbo d/b/a Monahan Commercial Cleaners, Inc., and add defendants Monahan Cleaners and Monahan Building. Although counsel for Sage appeared for defendant Palumbo, after plaintiffs' motions to amend were granted and defendant Monahan Cleaners was added, counsel did not enter an appearance for the latter defendant. Counsel for Monahan Building appeared only for this one defendant, and at trial both counsel for Sage and counsel for Monahan Building stated that they did not represent Monahan Cleaners. Accordingly, the Court finds that Monahan Cleaners did not appear in this action and thus was not entitled to written notice pursuant to Fed.R.Civ.P. 55(b)(2) prior to any hearing on an application for default judgment.

Moreover, although no motion for default judgment was filed with the Court, at the commencement of trial Monahan Building's counsel reported that he had just then received written notice from plaintiff Hasselman's counsel that she would move for default judgment. Hasselman's counsel explained to the Court that Hasselman had not moved earlier for a default judgment against Monahan Cleaners because counsel only discovered a few days before trial that Sage's counsel was not also representing Monahan Cleaners. The Court has some difficulty accepting this explanation, however, for the record reveals that Sage's counsel never answered plaintiff Hasselman's amended complaint on behalf of Monahan Cleaners. In any event, the Court notes that, to the extent it exists at all as a viable corporate entity, Monahan Cleaners had constructive notice of the proceedings against it, inasmuch as Palumbo, its principal, who now is associated with Monahan Building, appeared as a witness at trial.

Baxter, Hasselman was interviewed by Melvyn Kaufman, the president of Sage, at his office at 437 Madison Avenue. After discussing with Hasselman her prospective duties as a lobby attendant, Kaufman approved her employment. She was requested to report the following week to 711 Third Avenue to begin work.

When she reported to 711 Third Avenue the next week, Hasselman was directed by Baxter to proceed to the offices of National Cleaning Contractors ("National"), on whose payroll she was placed,[6] where she completed certain personnel forms. She then returned to 711 Third Avenue and at that time received instructions on her duties from Baxter and her two new coworkers (one male, one female). Though Hasselman was carried on the payroll of National (and later Monahan Cleaners), Sage, acting in most cases through Baxter, trained Hasselman, established her job duties, and supervised her day-to-day work from the time she commenced her employment in February 1973 until her discharge on June 4, 1976. On at least two occasions during Hasselman's employment, in January 1974 and in March 1975, Sage distributed a document entitled "Instructions for Ground Floor Personnel." [7]

Plaintiff Hasselman's job as a lobby attendant included security, safety, maintenance and information functions. For instance, as a lobby attendant Hasselman kept an eye on the elevators to make sure they were in working order and reported any elevator problems to maintenance personnel. She offered assistance and information to people entering the building and kept those who did not belong in the building from loitering. Hasselman's duties required her to replace defective light bulbs and to report any conditions in the lobby requiring the attention of cleaning personnel.

Sage furnished uniforms to all lobby attendants working in the buildings it managed. The uniforms were selected and paid for by Sage and after use remained Sage's property. During the period of Hasselman's employment, new uniforms were issued approximately every six months, each spring and fall.[8] The "Instructions for

---

6. See n.4, *supra.*

7. The document described the purpose of the lobby attendant job as follows:
   To be responsible for the SAFETY of the building, tenants and general public.
   To be responsible for the *comfort* of the tenants and the general public.
   To be *hosts* and *hostesses* for the building. Remember that you are standing in as the representatives for the owners of the building.
   You should be warm, friendly, courteous, yet firm should there be a disruption of [sic] disturbance with tenants and visitors.
   You have complete respnsibility [sic] for the lobby, elevators, and entire ground floor from curb to curb. This includes the responsibility of following up a noticed and/or reported condition.
   You should bear in mind at all times that the general public is your personal guests [sic]. The physical areas should be SUPER-CLEAN at all times, as if *company is expected!*
   (Emphasis in original)

8. Over the course of her 28 months of employment at 711 Third Avenue, plaintiff Hasselman wore seven separate outfits, including the ill-fated Bicentennial uniform. From February 1973 until the spring 1973 uniforms were issued, Hasselman wore the fall 1972 uniform left by her predecessor, a riding outfit that consisted of riding jodhpurs, boots, a jacket, a white ascot, and a riding cap. The spring 1973 uniform, a light-blue jeans outfit, came with two pairs of slacks and two plaid skirts and was to be worn alternately with espadrilles and cowboy boots. In the fall of 1973 the lobby attendants were issued a skirt-and-blouse combination to be worn with an overdress that came with a cape, a brimmed hat and patent leather pumps.
   The next uniform, distributed by Sage in the spring of 1974, was a tennis outfit, consisting of a blouse, a pair of white pants, a white tennis dress, and a pleated skirt to be worn with lace panties. White espadrilles also were issued. Although the pants, tennis dress and pleated skirt were to be worn on alternating days, Hasselman, claiming it was too revealing, refused to wear the tennis dress without also wearing the pants underneath.
   In the fall of 1974 the female lobby attendants were directed to wear a kilt outfit. This uniform was distributed with two overlapping, wraparound skirts (one knee length and the other ankle length), two blouses and a sweater. According to Hasselman, Sage directed that the skirts be worn with an additional slit up the side, open to mid-thigh, and without stockings. Hasselman, however, pinned the side slits of

Ground Floor Personnel" (Mar. 31, 1975), referenced above, provided in no uncertain terms that the lobby attendants were to wear the Sage-issued uniforms at all times and that "NO EXCUSES FOR BEING OUT OF UNIFORM [WOULD] BE ACCEPTED." (Plaintiffs' exhibit 14, at seventh of 15 unnumbered pages; emphasis in original)

Effective October 31, 1975, the contract between Sage and National, under which National performed cleaning services for Sage, was terminated. On October 15, 1975, Sage entered into a contract with Monahan Cleaners, effective November 1, 1975, by which Monahan Cleaners was to perform cleaning services similar to those previously provided by National. The agreement preserved Sage's right to approve the employment of all lobby attendants, denominated in the October 15th contract as "lobby receptionists."

In February or March 1976 Sage commissioned a graphic design firm, Pamela Waters Studio Inc., to develop a design concept for the uniforms to be worn by Sage's lobby attendants during the following spring and summer seasons. The Waters Studio presented Kaufman, Sage's president, with several designs. Kaufman approved a uniform known as the Bicentennial uniform, apparently developed to celebrate the nation's bicentennial year. The outfit resembled an American flag. It consisted of broad stripes of red, white and blue material sewn together. Each stripe was approximately 13 inches wide, and the uniform bore three stars across the front.

The Bicentennial uniform was constructed in the shape of a red-white-and-blue octagon with an opening in the center for the lobby attendant's head. This spring 1976 outfit was to be worn as a poncho, or cape, draped over the shoulders, with snaps at each wrist and stitching in the form of tacks, one tack at each side. The uniform was otherwise open at the sides. Underneath the poncho the lobby attendants wore blue dancer pants and sheer stockings. The Bicentennial uniform was to be worn with white, low-heeled shoes. The lobby attendants were not permitted to wear a shirt or blouse, a Danskin, pants or a skirt under the outfit.

The Pamela Waters Studio retained a seamstress to manufacture the uniforms. Although Sage's female lobby attendants were of different sizes, the uniforms were supposed to be made in one size only.[9] Moreover, the outfits were poorly made, had uneven hems, and contained little additional fabric that could be used to enlarge the garments to fit different individuals.

The first Bicentennial uniforms were delivered to the lobby attendants on or about May 12, 1976. When Hasselman tried on her uniform, she found it short and revealing on both sides. Her thighs and portions of her buttocks were exposed, and understandably she was concerned about wearing the outfit in the 711 Third Avenue lobby.

Hasselman had been told by Sage that if she had any problems with her uniform she was to call the Pamela Waters Studio. She

her kilts and wore her uniform with stockings, apparently without objection by Sage.

The spring 1975 uniform was a second jeans outfit, this one navy blue and issued with a light blue work shirt bearing "Sage" written across the back, to be worn with sneakers and with the pant cuffs rolled up. In the fall of 1975, Sage distributed a knee-length beige jumper outfit that came with a rust-colored turtleneck, leather wedged shoes and a beret. This was followed by the spring 1976 Bicentennial uniform, discussed in text *infra*, that is the focal point of this controversy.

Through the spring 1975 uniforms, the male and female lobby attendants were given different outfits where appropriate (the same jeans outfits, for example, could be worn by both

male and female attendants). In the fall of 1975, when Monahan Cleaners replaced National as the cleaning contractor at 711 Third Avenue and other Sage buildings, Sage no longer employed male lobby attendants.

9. For example, plaintiff Hasselman, at about 5-foot, 8-inches tall, was perhaps the tallest woman employed as a Sage lobby attendant in the spring of 1976. At trial Sage introduced a photograph of another lobby attendant, Angie Caratolla, dressed in the Bicentennial uniform. (Defendant Sage's exhibit A) On Caratolla, who looked to the Court from the photograph to be some 4 to 6 inches shorter than Hasselman, the outfit appeared much less revealing.

did so, complaining that her uniform did not fit properly. Shortly thereafter, Joan Petruska, an employee of the Waters Studio, came to 711 Third Avenue to inspect the fit of Hasselman's garment.[10] Petruska observed that the uniform was open above the thighs and that the blue dancer pants, worn underneath the outfit, were revealed when Hasselman assumed certain positions (positions she would likely be required to assume on the job). In addition, Petruska discovered, when Hasselman raised either of her arms the side of her body above the waist was visible. After inspecting the uniform and listening to Hasselman's complaints about it, Petruska promised to report the problem to the Waters Studio to see what could be done.

A few days after Petruska's visit, another Pamela Waters employee, Meta Shaw, visited Hasselman at 711 Third Avenue. Shaw observed the uniform on Hasselman, and she also found it to be too short. Hasselman had not as yet worn the Bicentennial uniform on the lobby floor.

Following the inspections by Petruska and Shaw, some alterations were made on Hasselman's uniform and it was lengthened slightly. The altered uniform, however, was uneven and remained as revealing as it had been in its unaltered form. Hasselman returned the outfit once again to the Pamela Waters Studio and requested that further alterations be made. The Bicentennial uniform was returned to Hasselman on May 26, 1976. Hasselman tried it on, found that it was still too revealing, and again complained to the Pamela Waters Studio. She was told, however, that at this point no further alterations would be made.

Following this conversation with the Waters Studio, and knowing Sage's uniform policy, Hasselman wore the uniform in the lobby of 711 Third Avenue on May 27 and May 28, 1976. While wearing the Bicentennial uniform and as a result of wearing it, Hasselman was subjected to repeated harassment. She received a number of sexual propositions and endured lewd comments and gestures. Humiliated by what occurred, Hasselman was unable to perform her duties properly.[11]

Although Hasselman complained to Baxter, Sage's building manager for 711 Third Avenue, about the fit of her uniform and the harassment to which she was being subjected, Baxter took no steps to remedy the situation. As a result Hasselman determined not to wear the Bicentennial uniform and, presumably beginning on June 1, 1976

10. Before she visted 711 Third Avenue, however, Petruska spoke with another lobby attendant, later identified as Christina Falda, in the presence of Sage's Kaufman. After observing that this young woman's uniform was crooked, Petruska overheard Falda tell Kaufman that she did not want to wear the uniform and that, if she had wanted to wear a uniform like the Bicentennial outfit she had just been issued, she would have sought work as a cocktail waitress. In response, Kaufman said he saw nothing wrong with the uniform. Falda's employment as a lobby attendant was terminated on May 26, 1976.

11. Barbara Morrow, an employee of one of the tenants at 711 Third Avenue, had occasion to observe Hasselman in the Bicentennial uniform. In her testimony, Morrow described the uniform as follows:

It looked as though a piece of flag had been enlarged and cut to fit like a poncho with a slit down the front and slits up the sides and very open sleeves. It was cut sort of on a diagonal so it was a bit like a V in the middle....

When she raised her arms you could often see her underwear ....

After viewing photographs of Hasselman in the Bicentennial uniform (plaintiffs' exhibits 23–A through 23–G), Morrow testified:

When she moved, of course, it fluttered and since it was very open and since there were slits everywhere, it was more provocative than a still picture because you never knew what you were going to see next. Sometimes you would see something, sometimes you wouldn't. Sometimes you would see her underwear and sometimes you would see her leg and it has quite a different impact when you look at it in motion.

On those days when Hasselman was in her Bicentennial outfit, Morrow observed her to be upset and angry. Morrow saw some of the cause of Hasselman's discomfort: "The[re] were both comments and noises. People [would] whistle Yankee Doodle or Stars and Stripes and [make] comments that we would consider puns on the flag like 'I'll run it up the flag pole any time you want to.'"

(the Tuesday following the 1976 Memorial Day holiday), wore the previously issued uniform, the fall 1975 beige jumper outfit.

By letter dated June 2, 1976, addressed to Sage's president Kaufman with copies to Monahan Cleaners' president Angelo Palumbo and Baxter, Hasselman again notified defendants Sage and Monahan Cleaners of the revealing nature of the uniform and the harassment to which she had been subjected when she wore it.[12] The letter was received at the Sage offices on June 3, 1976, and, in a letter dated June 4, 1976, Kaufman responded. In his reply letter Kaufman stated, among other things, that "all ground floor personnel are required to wear the uniforms supplied. There are no exceptions to this requirement." (Plaintiffs' exhibit 25)

On June 4, 1976, Baxter observed Hasselman in the lobby out of uniform and reported the matter to Kaufman. Kaufman ordered Hasselman removed from the floor. Baxter then told either Palumbo or someone else at Monahan Cleaners that plaintiff Hasselman was not wearing her uniform and that Kaufman wanted her off the floor.

Up to the time of this incident on June 4, 1976, Baxter testified, Hasselman had performed her job satisfactorily. Indeed, according to the testimony of all witnesses other than Palumbo (whose credibility on this point the Court found subject to con-

siderable question), Hasselman was an excellent employee.

The Court finds that at the time he told Baxter he wanted Hasselman removed from the lobby of 711 Third Avenue Kaufman was aware of the nature of her complaints. Yet he did not act to remedy the situation. Instead, Kaufman gave Hasselman the choice of either wearing the uniform or leaving the floor. Since Hasselman's job required her to be on the lobby floor, this meant that if she would not wear the uniform she was discharged.

On June 4, 1976, after she was observed out of uniform by Baxter, Hasselman received a visit from an employee of Monahan Cleaners, a Mr. Constantino, who tried to persuade her to wear the Bicentennial outfit. When she refused, Constantino left. Later that day, Palumbo's secretary, a woman named Maria, called Hasselman and inquired if Hasselman was still not in uniform. When Hasselman confirmed that she was not wearing the required garment, Maria, acting on Palumbo's authority, told her to leave the floor. Hasselman promptly left 711 Third Avenue and did not return.

On Monday, June 7, 1976, Hasselman visited the office of Monahan Cleaners and met with Palumbo. At that time she asked Palumbo why he had not spoken to her directly in connection with her discharge the preceding Friday. Palumbo responded that he had not done so because there was

---

**12.** Hasselman raised two points in her letter: First, the uniform is apparently designed in such a way that it is sexually revealing. This is a fact because the uniform consists only of a poncho and nothing else. I always see my post in the lobby as one which is charged with definite duties and responsibilities. None of these duties and responsibilities either as those stipulated in the "Building-rules for gound-floor personnel" [sic] or those verbally given by you and other supervisors, requires me to be a sex symbol in skimpy costume. In the two days I tried to accommodate the uniform rule with the new uniform, I was subjected to all kinds of harassments, abuses, propositionings [sic] and ridicules. My co-workers and many of the tenants can stand witness to these. To put it simply, the uniform that I am required to wear is degradative [sic] to my character and offensive to me as a woman.

The second reason for my objection to the new uniform is that it is entirely inapproprite [sic], extremely incompatible and in fact is an outright interference with my duties in the lobby. Under constant harassments and abuses, one cannot function and perform with one's full capacity. To me there is no exception. Moreover, the uniform misrepresents my duties in the lobby by making me appear to be a sex object, making it more difficult for me to carry out my normal duties. In addition, the uniform poses a physical hazard. With its cape-like design, it flares as one walks, and it is easy to imagine it being caught between elevator doors and the like. It is ironic that one of my duties is to insure the safty [sic] of the elevators, especially in case of emergency.
(Plaintiffs' exhibit 24)

nothing he could do. He then asked her to reconsider wearing the uniform. When Hasselman told Palumbo that she would not do so, he offered to sign a "lay-off letter" stating that Hasselman had lost her job because of lack of work. Hasselman accepted the letter, dated June 7, 1976 (plaintiffs' exhibit 26), and left.

The Court has viewed photographs of Hasselman in the Bicentennial uniform and finds that on Hasselman the uniform was short, revealing and sexually provocative. It could reasonably be expected that were such an outfit to be worn by plaintiff Hasselman in the lobby at 711 Third Avenue, as it was for two days, she would be subjected to sexual harassment.

Apparently conceding, at least *arguendo*, that the uniform was short on Hasselman, defendant Sage contends that a new and larger uniform was made for her. The Court has been unable to determine whether any new or larger uniform was in fact sewn for Hasselman. In any event, however, the Court finds that no such new or larger uniform was ever delivered to Hasselman and that she was never told a new uniform was being made and would be delivered to her at some future time.

There is no question that defendants Sage and Monahan Cleaners required Hasselman to wear the Bicentennial uniform because she is a woman. Due to its revealing nature, the uniform caused Hasselman to endure harassment in the performance of her job. The wearing of the uniform was made a condition of Hasselman's employment, and her employment was terminated when she refused to continue wearing the garment.

Plaintiffs assert that, in issuing and requiring Hasselman to wear the Bicentennial uniform as a term and condition of her employment, and in firing her for refusing to wear the outfit, defendants violated section 703(a) of the Civil Rights Act of 1964. 42 U.S.C. § 2000e–2(a). The section provides:

It shall be an unlawful employment practice for an employer—

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or

(2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

■ To prevail on their claim that defendants committed an unlawful employment practice pursuant to section 703(a), plaintiffs must prove that a term or condition of employment was imposed on Hasselman and that this term or condition was imposed on the basis of sex. Plaintiffs have the burden of establishing a prima facie case of sex discrimination. *See Dothard v. Rawlinson*, 433 U.S. 321, 328–331, 97 S.Ct. 2720, 2726–28, 53 L.Ed.2d 786 (1977), and *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973) (racial discrimination). Although the ultimate burden of persuasion remains with plaintiffs, once plaintiffs present evidence sufficient to make their prima facie showing, the burden of production shifts to defendants to rebut the prima facie case by articulating a legitimate, nondiscriminatory reason for their actions. *Board of Trustees of Keene State College v. Sweeney*, 439 U.S. 24, 99 S.Ct. 295, 58 L.Ed.2d 216 (1978) (per curiam); *Furnco Construction Corp. v. Waters*, 438 U.S. 567, 578, 98 S.Ct. 2943, 2950, 57 L.Ed.2d 957 (1978); *Lieberman v. Gant*, 630 F.2d 60, 65 (2d Cir. 1980); *Jackson v. U.S. Steel Corp.*, 624 F.2d 436, 442 (3d Cir. 1980).

■ The Court finds that plaintiffs established their prima facie case by demonstrating, first, that as a condition of her employment Hasselman was required to wear the Bicentennial uniform; second, that Sage and Monahan Cleaners imposed this condition; and, third, that but for her

womanhood Hasselman would not have been required to appear on her job in the lobby of 711 Third Avenue in a uniform that subjected her to sexual harassment. Sage and Monahan Cleaners required Hasselman to wear, as a condition of her employment, a uniform that was revealing and sexually provocative and could reasonably be expected to subject her to sexual harassment when worn on the job—and a uniform that Sage and Monahan Cleaners knew did subject her to such harassment. Defendants, on the other hand, have not offered any legitimate, nondiscriminatory explanation for imposing this condition, and thus have failed to rebut plaintiffs' prima facie showing.[13]

■ Hasselman's refusal to wear the sexually revealing Bicentennial uniform resulted in her discharge. Although in this case the Court finds that Hasselman was discharged for refusing to comply with the sex-based terms and conditions of employment imposed by defendants, to succeed on their Title VII claims here it is not necessary that plaintiffs prove Hasselman was fired. Plaintiffs need only establish that defendants imposed on her a term or condition of employment which section 703(a) makes unlawful.[14] A victim of sexual discrimination who quits, rather than comply with an unlawful job requirement, does not forfeit the right to bring an action under section 703(a).

■ There is no dispute that as a condition of her employment as a lobby attendant Hasselman was required to wear a uniform selected and issued by Sage and, in the summer of 1976, to wear the Bicentennial uniform. Defendants, however, maintain that Hasselman was never required to wear a sexually revealing and sexually provocative garment. They claim that Hasselman was only required to wear the properly fitted, nonrevealing second uniform that they say was made for her after she complained about how poorly her original uniform fit her. The evidence reveals otherwise. The Court finds that even if a new uniform was made for her—as defendants contend—Hasselman was never told that she would only be required to wear this new, allegedly nonrevealing outfit.

Sage maintains that requiring Hasselman to wear the Bicentennial uniform was a proper exercise of its right to require an employee to work in company-prescribed attire. The Court does not question an employer's prerogative to impose reasonable grooming and dress requirements on its employees, even where different requirements are set for male and female employees, when those requirements have a negligible effect on employment opportunities and present no distinct employment disadvantages. The prerogative to impose reasonable grooming and dress requirements, however, as this Court ruled in denying

**13.** If a defendant's rebuttal is successful, to prevail the sex-discrimination plaintiff must then show that the allegedly nondiscriminatory reason stated by the defendant is a mere pretext for discrimination. *McDonnell Douglas Corp. v. Green, supra,* 411 U.S. at 804, 93 S.Ct. at 1825. "If the plaintiff shows that the employer's stated reason ... was a pretext, ..., the employer's reason will not stand." *Grant v. Bethlehem Steel Corp.,* 622 F.2d 43 (2d Cir. 1980). But when a plaintiff is unable to overcome the legitimate, nondiscriminatory reasons articulated by the defendants, her action must fail. *Lieberman v. Gant, supra; Lamphere v. Brown University,* 491 F.Supp. 232 (D.R.I. 1980). Defendants here, however, have articulated no such legitimate reason. Indeed, at trial Sage expressly denied it had any intention to dress its lobby attendants in sexually revealing attire. Sage litigated this case on the simple factual averment that it had not required

plaintiff Hasselman to wear a revealing uniform. Even though the Court need not determine whether defendants' uniform requirement was a pretext for sex discrimination, were it required to do so the Court would have no difficulty finding the requirement that as a condition of employment Hasselman wear a *sexually revealing* uniform in the lobby of 711 Third Avenue was indeed a pretext for sex discrimination.

**14.** The proper question is not whether the victimized employee resigned or was discharged, but whether she acted *reasonably* in quitting rather then suffering the effects of discrimination. *Cf. DeGrace v. Rumsfeld,* 614 F.2d 796, 806 (1st Cir. 1980). The Court finds that here plaintiff Hasselman acted reasonably in refusing to wear the Bicentennial uniform she was issued.

defendants' motion for summary judgment, does not mean that "an employer has the unfettered discretion... to require its employees to wear *any* uniform the employer chooses, including uniforms which may be characterized as revealing and sexually provocative." *EEOC v. Sage Realty Corp.*, 87 F.R.D. 365, 371 (S.D.N.Y.1980).[15]

Sage's and Monahan Cleaners' requirement that Hasselman wear the Bicentennial uniform, when they knew that the wearing of this uniform on the job subjected her to sexual harassment, constituted sex discrimination of the same nature as that found by the Third and District of Columbia Circuits in *Tomkins v. Public Service Electric & Gas Co.*, 568 F.2d 1044 (3d Cir. 1977), and *Barnes v. Costles*, 561 F.2d 983 (D.C.Cir.1977).

Although in *Tomkins* and *Barnes* the victims of sex discrimination were subjected to the direct sexual advances of their supervisors, the reasoning of those courts is entirely apposite here, where Sage and Monahan Cleaners knowingly allowed Hasselman, a female employee, to remain, as a condition of her employment, in a position where she would be subjected to sexual harassment on the job. Indeed, the *Tomkins* court, in holding the corporate employer responsible for the conduct of the supervisor of its complaining female employee, grounded its ruling on the allegation that the corporate defendant knowingly or constructively made Tomkins' acquiescence in her supervisor's advances a job prerequisite. 568 F.2d at 1047. The situation here is directly analogous. In requiring Hasselman to wear the revealing Bicentennial uniform in the lobby of 711 Third Avenue, defendants made her acquiescence in sexual harassment by the public, and perhaps by building tenants, a

---

15. Although the reasoning supporting their decisions differs, at least seven circuits have ruled that Title VII does not prohibit an employer from making reasonable employment decisions based on factors such as grooming and dress. The Seventh Circuit, however, in *Carroll v. Talman Federal Savings and Loan Ass'n*, 604 F.2d 1028 (1979), *cert. denied*, 445 U.S. 929, 100 S.Ct. 1316, 63 L.Ed.2d 762 (1980), found that a requirement that female employees wear a, specified "career ensemble," while at the same time male employees were allowed to wear customary business attire, was a violation of Title VII. Three circuits held that grooming and dress requirements do not violate Title VII unless the requirements were based on immutable sex characteristics or affected constitutionally protected activities (such as marriage, *see Phillips v. Martin Marietta Corp.*, 400 U.S. 542, 91 S.Ct. 496, 27 L.Ed.2d 613 (1971), and child rearing, *Sprogis v. United Air Lines, Inc.*, 444 F.2d 1194 (7th Cir.), *cert. denied*, 404 U.S. 991, 92 S.Ct. 536, 30 L.Ed.2d 543 (1971)). *Earwood v. Continental Southeastern Lines, Inc.*, 539 F.2d 1349 (4th Cir. 1976); *Willingham v. Macon Telegraph Publishing Co.*, 507 F.2d 1084 (5th Cir. 1975) (en banc); *Dodge v. Giant Foods, Inc.*, 488 F.2d 1333 (D.C.Cir.1973) (per curiam); *Fagan v. National Cash Register Co.*, 481 F.2d 1115 (D.C. Cir.1973). Two other circuits reasoned that employer grooming requirements do not amount to Title VII violations where there is only a negligible effect on employment opportunities. *Barker v. Taft Broadcasting Co.*, 549 F.2d 400, 401 (6th Cir. 1977) ("Employer grooming codes requiring different hair lengths for men and women bear such a negligible relation to the purposes of Title VII that we cannot conclude they were a target of the Act."); *Knott v. Missouri Pacific Railroad Co.*, 527 F.2d 1249 (8th Cir. 1975). Apparently without adopting any particular reasoning, two circuits simply held that a short-hair requirement applied only to men does not amount to an unlawful employment practice under Title VII. *Fountain v. Safeway Stores, Inc.*, 555 F.2d 753 (9th Cir. 1977); *Longo v. Carlisle De Coppet & Co.*, 537 F.2d 685 (2d Cir. 1976) (per curiam). None of these court of appeals cases or their district court progeny, *see, e. g., Lanigan v. Bartlett & Co. Grain*, 466 F.Supp. 1388 (W.D.Mo.1979) (office ban on women wearing pants not Title VII violation), address a situation such as presented here. Unlike the employer grooming policies before the courts in *Earwood, Willingham* and *Dodge*, Sage's requirement that Hasselman wear a sexually revealing outfit in a public lobby unquestionably had an effect on her right of privacy. Moreover, in contrast to the findings in *Barker* and *Knott*, defendants' uniform requirement here had much more than a negligible effect on Hasselman's employment opportunities.

The Court is of course well aware that in this case there was *no discrimination per se* in dress requirements between male and female lobby attendants. In the spring of 1976 defendants did not employ male lobby attendants. Defendants adopted an all-female "lobby hostess" practice in the fall of 1975. The Court is persuaded, however, that had they employed male attendants in May 1976 defendants surely would not have required these men to wear the Bicentennial costume.

prerequisite of her employment as a lobby attendant.[16]

Contending that its uniform requirement constitutes artistic expression, Sage argues that to the extent Title VII as applied in the instant case prohibits this employer from dressing its lobby attendants in an outfit such as the Bicentennial uniform, Title VII is an unconstitutional affront to freedom of expression in violation of the first amendment. Whatever merit this argument may have in other instances, it has no merit here. The issue before the Court in this case is not whether defendant Sage could permissibly outfit its lobby attendants in a Bicentennial costume, or in any other employer-designed uniform, but whether Sage could require plaintiff Hasselman, a female lobby attendant, to wear a uniform which subjected her to sexual harassment on the job. Sage has disclaimed any intention to express itself artistically by dressing its lobby personnel in sexually revealing outfits.[17]

**16.** Employers may once have been able to engage with impunity in the type of conduct that unquestioningly allowed women to be treated as sex objects. But this is no longer the case. Title VII's prohibition of sex discrimination was "intended to strike at the entire spectrum of disparate treatment of men and women resulting from sex stereotypes." *Sprogis v. United Air Lines, Inc., supra,* 444 F.2d at 1198. *See also Rodriguez v. Board of Education of E. Chester Union Free School Dist.,* 620 F.2d 362, 366 (2d Cir. 1980), and *Carroll v. Talman Federal Savings and Loan Ass'n, supra,* 604 F.2d at 1030, 1033.

**17.** The following exchange took place during closing arguments:

MS. SALTEN–SMITH [counsel for Sage]: Your Honor, it is the position that [sic] the defendant Sage that it has proven that there was a reasonable basis for this issuance of the Bicentennial uniform as well as every other uniform, but in this case we are focusing on the Bicentennial. It was not intended to be discriminatory in its purpose or effect and was not designed to be provocative and was not designed for a sexual reason. There is no doubt that the purpose of the uniform is an expression of the creativity and the artistic expression of Melvyn Kaufman and his philosophy in relation to his designs of his buildings, the designs of his lobbies and the functions of the lobby attendants in the buildings.

THE COURT: If Melvyn Kaufman had been putting on a 4th of July pageant back in 1976, and he garbed his actresses or his performers in this costume and asked them to perform in a pageant on a stage, I could have no quarrel with his doing that. But he took people who were employed not in a theatre where you expect to show yourself, but much more mundane people who were employed in lobbies, in close physical contact with the people who come and go.

MS. SALTEN–SMITH: Your Honor, if I might, the Bicentennial uniform was done in the spirit of the celebration of '76. There is evidence to that, it cannot be refuted. The activities of the lobby attendants are not as what your Honor described as lobby starters. Their purposes and activities were to relate, as Mr. Kaufman has said, add fun to the City and add a humanistic value.

THE COURT: They didn't put on five shows a day, though, did they?

MS. SALTEN–SMITH: No, but this was in a very real sense, your Honor, and this is not something that I am making up or that I feel, it was testified to, that this was created in the same sense as the Walt Disney creation of his Disneyland.

Mr. Kaufman said that he followed Walt Disney's ideas in relation to uniforms and in relation to their expression toward the public and in relation to their expression toward the premises they are in.

I have the testimony and I would read it to you, your Honor. This is exactly what your Honor has said that it isn't. It was in a sense a pageant, a point of four months in 1976 when this was Bicentennial fever, it was throughout this whole City and throughout this whole country as a matter of fact.

It was in celebration, it was a dynamism, it was a change, it went together with this change in the flags, the Betsy Ross flag and the other flag and the demonstrations.

This is not the situation. There is just a staid type of occupation, where the lobby hostesses that came into this occupation and into this job, knew that this was not a staid type of place where they would be doing a staid type of work.

They knew they would be dealing with the public, they knew they would be changing their uniforms. It was all explained to them and it was a creation of what this whole lobby and the functions of the lobby hostesses together represented.

THE COURT: Let me ask this question: does Sage contend that it was exercising its First Amendment right to dress lobby attendants in sexually provocative and revealing costumes or just uniforms?

MS. SALTEN–SMITH: Your Honor, for the purpose of the record, I think that without conceding anything, I think there would be instances where a person could carry out his

Similarly without merit is any contention that the wearing of a sexually revealing Bicentennial uniform is a bona fide occupational qualification ("bfoq") pursuant to section 703(d). While it may well be a bfoq for Sage to require female lobby attendants in its buildings to wear certain uniforms designed to present a unique image, in accordance with its philosophy of urban design, it is beyond dispute that the wearing of sexually revealing garments does not constitute a bfoq. Indeed, the evidence establishes that wearing the uniform interfered with Hasselman's ability to perform her job.

■ Accordingly, the Court finds that Sage and Monahan Cleaners, in discriminating against plaintiff Hasselman on the basis of sex, committed an unlawful employment practice in violation of section 703(a).[18]

■ Defendant Sage did not carry plaintiff Hasselman on its payroll as a direct employee. During the spring of 1976, Hasselman was paid by Sage's cleaning contractor, Monahan Cleaners. Sage therefore argues that inasmuch as it was not an employer of Hasselman it cannot be held liable under Title VII. The Court, however, ruled in its decision denying summary judgment that Sage could be liable if it were found to have been a joint employer of plaintiff Hasselman along with Monahan Cleaners.

*EEOC v. Sage Realty Corp., supra,* 87 F.R.D. at 370–71. The factual question whether Sage was joint employer was left to trial. *Id.*

Sage, of course, contends that it was not a joint employer with Monahan Cleaners within the meaning of Title VII. Although section 703(a) makes unlawful only discriminatory employment practices of an "employer," this term has been construed in a functional sense to encompass persons who are not employers in conventional terms, but who nevertheless control some aspect of an employee's compensation or terms, conditions, or privileges of employment. *Spirt v. Teachers Insurance and Annuity Ass'n,* 475 F.Supp. 1298, 1307–08 (S.D.N.Y.1979). Although Hasselman was on the payroll of National from January 1973 through October 31, 1975, and on Monahan Cleaners' payroll from November 1, 1975, until her discharge on June 4, 1976, Sage exercised considerable control over the terms and conditions of her employment. Sage hired, trained and supervised Hasselman, and ultimately ordered her discharge. Sage controlled the uniform policy challenged here. The Court finds that Sage was a joint employer of Hasselman within the meaning of Title VII and is liable, along with Monahan Cleaners and Monahan Building, for the violation of section 703(a).[19]

■ Since Monahan Building was not in existence in the spring of 1976, it can be

First Amendment right and have sexually provocative uniforms such as in the Playboy Club.

I think that your Honor would say that those uniforms, the shortness of them, the tip of them, might be considered sexually provocative. In that instance, however, that is a reasonable manner in which to assign uniforms because *it is the type of place and the surroundings in which it is conducted.*

However, in the issue [sic] of Sage, Sage denies that these uniforms were sexually provocative.

18. During closing argument defendant Sage also raised an argument to the effect that the EEOC's investigation and litigation of Hasselman's claim pursuant to § 706(f)(1), 42 U.S.C. § 2000e–5(f)(1); was an unconstitutional violation of the fifth amendment's due process clause. This argument took the Court somewhat by surprise, inasmuch as there had been no indication Sage would pursue such a conten-

tion. Moreover, Sage adduced no evidence at trial to support a claim that the EEOC's actions violated the defendants' due process rights. In any event, the Court finds no due process problems here. The Commission complied with its statutory mandate, and all preconditions of this lawsuit have been satisfied. Defendants received notice of all charges and were invited to participate in the administrative investigation. The trial before this Court constituted a hearing *de novo*, at which defendants enjoyed all the procedural guarantees the fifth amendment affords. Sage's due process claim therefore is without merit.

19. Sage and Monahan Builders are employers within the meaning of § 701(b), 42 U.S.C. § 2000e(b). Monahan Cleaners was an employer within § 701(b) at the time of the occurrence of the acts of sex discrimination at issue here.

found liable to plaintiffs only if it is the successor corporation to Monahan Cleaners. Applying the factors set forth in the Sixth Circuit's decision in *EEOC v. MacMillan Bloedel Containers, Inc.*, 503 F.2d 1086, 1094 (1974) (a case relied on both by plaintiffs and by defendant Monahan Building); *accord, NLRB v. Hudson River Aggregates, Inc.*, 639 F.2d 865 (2d Cir. 1981), the Court finds that Monahan Building is the successor corporation to Monahan Cleaners and is liable for the discriminatory acts of its predecessor.[20]

Monahan Building is a New York corporation engaged in the business of providing cleaning services. In August 1977, Sage entered into a contract with Monahan Building which required Monahan Building to furnish cleaning services at 711 Third Avenue. In the contract Sage gave its permission to Monahan Cleaners to sell to Monahan Building all the rights, title and interest of Monahan Cleaners in and to the contracts between Sage and Monahan Cleaners dated October 15, 1975, and August 19, 1976. According to the August 1977 contract Sage recognized Monahan Building as the successor of Monahan Cleaners' rights and obligations in and to the contracts between Sage and Monahan Cleaners dated October 17, 1975, and August 19, 1976.

In addition, Monahan Building acquired all of Monahan Cleaners' cleaning equipment and hired over ninety percent of Monahan Cleaners' employees. The persons hired by Monahan Building who had formerly worked at Monahan Cleaners performed essentially the same duties for Monahan Building as they had performed for Monahan Cleaners. Monahan Building assumed all of the obligations under the collective bargaining agreement that covered the employees, including lobby attendants, who formerly worked for Monahan Cleaners and who subsequently were hired by Monahan Building.

Under Monahan Building's contract with Sage, Sage continues to prescribe the job standards for the job of lobby attendant. Both Sage and Monahan recruit applicants for the lobby attendant position. The approval of Sage is required before any applicant for the lobby attendant job is placed on the payroll of Monahan Building. In addition, Sage continues to prescribe, provide and own the uniforms worn by the lobby attendants. Palumbo, who was president of Monahan Cleaners, is now a full-time consultant to Monahan Building, overseeing the operation of Monahan Building's business and supervising Monahan Building's employees. Monahan Building had constructive notice of Hasselman's charge of sex discrimination through Palumbo.

█ Turning to defendant Monahan Building's cross-claim against defendant Sage, the Court finds insufficient evidence to support Monahan Building's contention that Sage is solely to blame for the acts of discrimination against plaintiff Hasselman. Although Sage controlled the uniform policy for the lobby attendants in its buildings and took the principal role in supervising the attendants' activities, Monahan Building remained their employer. More impor-

---

**20.** Drawing on cases addressing the question of successor corporate liability in the labor context, the court in *EEOC v. MacMillan Bloedel Containers, Inc., supra*, 503 F.2d at 1094, suggested that the following factors be considered in Title VII actions:

1) whether the successor company had notice of the charge, 2) the ability of the predecessor to provide relief, 3) whether there has been a substantial continuity of business operations, 4) whether the new employer uses the same plant, 5) whether he uses the same or substantially the same work force, 6) whether he uses the same or substantially the same supervisory personnel, 7) whether the same jobs exist under substantially the

same working conditions, 8) whether he uses the same machinery, equipment and methods of production and 9) whether he produces the same product.

The court in *NLRB v. Hudson River Aggregates, Inc., supra*, 869 held that:

Relevant factors in determining whether a new employer is a successor, for purposes of [collective] bargaining obligations, include whether the new employer is using the same supervisory personnel, equipment, and facilities as its predecessor, whether it is producing the same goods, and whether there is a substantial identity in the work force before and after the change in ownership.

tantly, there was no evidence adduced at trial (other than Palumbo's self-serving statement to Hasselman on June 7, 1976) that Monahan Building was powerless to remedy the situation created by Hasselman's ill-fitting uniform. At the very latest Monahan Building knew of Hasselman's complaint about her outfit when Palumbo received a copy of the June 2, 1976, letter she sent to Kaufman. Accordingly, Monahan Building's cross-claim is dismissed. The Court finds defendants jointly and severally liable for the unlawful employment practice committed against Hasselman.

■ Plaintiff Hasselman is entitled to recover fully for the losses she sustained as a result of her wrongful discharge. She is entitled to back pay, pension contributions and other benefits she would have received had she continued in her employment, reduced by the amount she earned after her discharge, including unemployment insurance benefits. *EEOC v. Kallir, Philips, Ross, Inc.*, 420 F.Supp. 919 (S.D.N.Y.1976), *aff'd mem.*, 559 F.2d 1203 (2d Cir.), *cert. denied*, 434 U.S. 920, 98 S.Ct. 395, 54 L.Ed.2d 277 (1977). The award of back pay shall not be reduced by the amount of any funds not actually received by Hasselman, however, inasmuch as defendants have failed to demonstrate that pursuant to section 706(g) there were any "amounts earnable with reasonable diligence" after Hasselman's discharge other than what she actually earned. Hasselman does not seek reinstatement.

Using the earnings figures stipulated to by the parties, the Court finds that Hasselman's income had she not been discharged would have been $56,702.72 from June 4, 1976, through the date on which trial was completed, September 22, 1980. Over that same period she would have received $1904.00 in pension contributions, for a total of $58,606.72. Plaintiff Hasselman received a total of $30,930.04 in earnings and unemployment insurance benefits over this period. Her net back-pay award thus is $27,-676.68.

Hasselman is also entitled to recover interest on her back pay. *Chapman v. Pacific Telephone & Telegraph Co.*, 456 F.Supp. 77, 80 (N.D.Cal.1978). The Court will allow eight percent annual interest compounded quarterly. Therefore, Hasselman shall receive a total award of $33,141.75.

Section 706(k) enables the Court to award plaintiff Hasselman reasonable attorneys' fees. Although section 706(k) on its face provides for awards of counsel fees at the district court's discretion, the policy developed by the Supreme Court favors awards of fees to successful plaintiffs unless there are special circumstances which would render such an award unjust. *New York Gaslight Club, Inc. v. Carey*, 447 U.S. 54, 100 S.Ct. 2024, 2033, 64 L.Ed.2d 723 (1980). Moreover, prevailing plaintiffs represented by public interest law firms are entitled to attorneys' fees on the same basis as if they had been represented by private attorneys. *EEOC v. Enterprise Association Steamfitters Local 638*, 542 F.2d 579, 592–93 (2d Cir. 1976), *cert. denied*, 430 U.S. 911, 97 S.Ct. 1186, 51 L.Ed.2d 588 (1977). Accordingly, plaintiff Hasselman is directed to serve and file her application for attorneys' fees within thirty days of the date of this decision. Both plaintiffs are awarded costs.

Inasmuch as judgment is not final until the amount of any award of attorneys' fees is determined, *Johnson v. University of Bridgeport*, 629 F.2d 828 (2d Cir. 1980) (per curiam), the Court will direct that judgment not be settled until it rules on Hasselman's application.

The foregoing constitutes the Court's findings of fact and conclusions of law in accordance with Rule 52(a), Fed.R.Civ.P.