DEPARTMENT OF CIVIL RIGHTS *ex rel* CORNELL v EDWARD W
SPARROW HOSPITAL ASSOCIATION

Docket Nos. 70546, 70578. Argued March 5, 1985 (Calendar No. 2).—
Decided November 22, 1985.

Starrla K. Cornell filed a complaint with the Department of Civil
Rights against Edward W. Sparrow Hospital following dis-
charge from her employment for refusing to comply with a
hospital dress code for laboratory personnel. A hearing referee
found in favor of the hospital, but the Civil Rights Commission
reversed, awarding Ms. Cornell, inter alia, back pay, finding
discrimination on the basis of sex under the Fair Employment
Practices Act. The hospital appealed to the Ingham Circuit
Court, and the court, Robert Holmes Bell, J., reviewing the
matter de novo, reversed the award of back pay, holding that
the dress code did not amount to such purposeful and invidious
discrimination as to prohibit the attainment of gainful employ-
ment. The Court of Appeals, M. J. KELLY, P.J., and T. M.
BURNS, J. (MACKENZIE, J., dissenting), affirmed in an opinion
per curiam and rejected the claimant's assertion of entitlement
to attorney fees under the Civil Rights Act (Docket Nos. 56528,
56535). The parties appeal.

In opinions by Chief Justice WILLIAMS, joined by Justices
CAVANAGH and BOYLE, by Justice RYAN, joined by Justice
RILEY, and by Justice BRICKLEY, the Supreme Court *held* that
the plaintiff should be awarded back pay.

Chief Justice WILLIAMS, joined by Justices CAVANAGH and
BOYLE, stated that an employee who is found to have been a
victim of unlawful discrimination under the Fair Employment
Practices Act generally should be awarded back pay. Back pay

REFERENCES FOR POINTS IN HEADNOTES

[1, 2, 4, 5] Am Jur 2d, Civil Rights §§ 431 *et seq.*

Award of back pay in suit under Title VII of Civil Rights Act of
1964, as amended by Equal Employment Opportunity Act of 1972
(42 USCS 2000e *et seq.*), for discriminatory employment practices.
21 ALR Fed 472.

[3, 6] Am Jur 2d, Civil Rights § 441.

Employee's duty to mitigate losses for NLRB backpay award under
29 USCS § 160(c) as requiring skilled employee to seek interim
job in different line of work. 32 ALR Fed 511.

should be denied only where the reasons for denial, if applied generally, would not frustrate the central purposes of the act to eliminate discrimination and to make whole the victim of discrimination.

1. The central purposes of the Fair Employment Practices Act were twofold: to eliminate discrimination and to make whole persons who suffered through discrimination. Following a finding of unlawful discrimination by an employer, an employee should not be denied back pay except for reasons which, if applied generally, would not defeat the central purposes. The purpose of eradicating discrimination has consistently been recognized in case law in construing the FEPA and its successor, the Civil Rights Act. Like Title VII of the federal Civil Rights Act of 1964, the FEPA also dealt with injuries that are largely economic in nature and had as a second major purpose making whole those who had suffered injury on account of discriminatory practices. Under federal law, back pay has been awarded in such cases as a matter of course, and the Legislature is presumed to have been aware of the practice when it enacted the back-pay provision of the FEPA.

2. In this case, the trial court applied an incorrect standard in deciding whether to award back pay to the claimant. Contrary to the holding of the trial court, whether the discrimination was purposeful and invidious in nature was not controlling. The FEPA did not seek to eliminate only purposeful and invidious discrimination, but all discrimination. An award of back pay serves two purposes: it encourages employers to examine and evaluate conditions of employment with an eye toward eliminating any that have a discriminatory effect, and it compensates the victim of discrimination. Awarding back pay only where purposeful and invidious discrimination is found would thwart both purposes.

3. Nor was the denial of back pay justified on the ground that the claimant failed to mitigate damages by complying with the dress code while simultaneously challenging its validity. Because the claimant actually sought employment elsewhere, the question of general mitigation does not arise. The hospital's offer of employment was not unconditional, but was specifically conditioned upon the claimant's compliance with the unlawful dress code. While as a general rule, a wrongfully terminated employee who seeks damages must accept employment either with a different employer or with the same employer in order to mitigate damages if the job is unconditional except as to back pay, nonetheless, where an employer refuses to allow an employee to return to work unless that employee complies with

an unlawful discriminatory condition of employment, the employee has not failed to mitigate damages.

4. It is not necessary to address the question whether the plaintiff was constructively discharged because she was actually discharged. At all times she was ready, willing, and able to work. The findings of both the hearing referee and the commission included statements that the dress code was made a condition of the plaintiff's employment and that she was "terminated" for failure to comply with its requirements. Even if the constructive-discharge doctrine were to be applied, the plaintiff would be eligible for back pay because a reasonable employee in her position would have felt compelled to resign. The minority's analysis of the doctrine to justify denial of back pay because management's ability to manage would be impaired and because emotional distress damages may be available to compensate a victim of discriminatory employment conditions must be rejected as inadequate and as fundamentally undermining the intent of the Civil Rights Act.

5. The question whether the claimant is entitled to attorney fees was not properly preserved for appellate review.

Justice RYAN, joined by Justice RILEY, concurring, agreed that the plaintiff was fired for refusing to comply with a discriminatory dress code and that she is entitled to back pay, but did not agree with the criticism of the rationale underlying the constructive-discharge doctrine. The constructive-discharge doctrine performs, inter alia, the useful function of weeding out frivolous claims. In a proper case, but not in this case, it might be appropriate for the Court to adopt the doctrine as the standard in determining whether back pay is due an employee who has voluntarily resigned. Back pay should be awardable only where an employee is discharged for refusal to comply with a discriminatory condition of employment, not regardless whether the employment is terminated by discharge or resignation. In this case, back pay should be awarded only to the extent that the plaintiff is determined to have been fired.

Justice BRICKLEY, concurring, agreed that the plaintiff should be awarded back pay, but wrote separately to express agreement with that portion of Justice LEVIN's dissent which states that constructive-discharge analysis should be applied in this case. Application of that analysis would result in a determination that the discriminatory action of the employer resulted in constructive discharge of the plaintiff.

Reversed in part, affirmed in part, and remanded.

Justice LEVIN, writing separately, stated that, as developed under federal case law, an employee who is not formally

discharged and who declines to work under an unlawful work-ing condition may be awarded back pay if the working condi-tion is so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign. If the working condition is found to be so difficult or unpleasant, the employee is deemed to have been constructively discharged, and back pay is awarded. If the working condition, although unlawful, is not so difficult or unpleasant, the employee is not deemed to have been constructively discharged and ordinarily is entitled to be reinstated, but is not entitled to back pay.

The constructive-discharge analysis applies whenever an em-ployee is in a position to continue working and chooses not to do so. When an employer discharges an employee, the employee cannot mitigate damages by continuing to work for the em-ployer. If the employee is not discharged, the employee ordinar-ily must, unless the unlawful discriminatory condition is so difficult or unpleasant, continue working while challenging the unlawful discriminatory condition. Because the employee is generally in a better position to mitigate damages and can ordinarily be made whole retroactively more readily than the employer, the burden has been placed on the employee, not the employer, to endure, at least temporarily, an endurable per-ceived injustice.

The central question is not whether a termination is classi-fied a resignation or a discharge, but whether an employee was justified in failing to mitigate damages by working under the challenged discriminatory condition while pursuing administra-tive and judicial remedies. This issue is not resolved by drawing a distinction between whether the employee quit or should be deemed to have been fired. In this case, the plaintiff was not discharged. She had the option of continuing employment under discriminatory conditions.

The plurality appears to hold that whenever an employer imposes a mandatory condition of employment, and the em-ployee chooses to leave the job rather than work under the condition, constructive-discharge analysis does not apply; im-posing the condition is deemed tantamount to actual discharge. This is an unduly narrow interpretation of the constructive-discharge doctrine that ignores the case law. Ordering an employee to wear a uniform as a condition of continued em-ployment does not differ from requiring an employee to accept less pay or a transfer as a mandatory condition of continued employment. The statement by the plaintiff's supervisor, "*go home . . .* and change clothes," does not justify a finding of actual discharge. She was told to go home so she could change

her clothes. The words "go home" added nothing to the statement that she would be required to comply with the working condition; they were merely incidental to the statement.

It is apparent that the circuit court did not apply the constructive-discharge analysis in deciding the back-pay issue. The question was not whether the dress code constituted purposeful and invidious discrimination, but rather whether the dress code constituted a working condition so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign. Thus, the case should be remanded to the circuit court for reconsideration of its decision regarding back pay and for application of the constructive-discharge mode of analysis.

119 Mich App 387; 326 NW2d 519 (1982) reversed in part and affirmed in part.

OPINION BY WILLIAMS, C.J.

1. CIVIL RIGHTS — EMPLOYMENT DISCRIMINATION — FAIR EMPLOYMENT PRACTICES ACT — BACK PAY.

   *An employee who is found to have been a victim of unlawful discrimination under the Fair Employment Practices Act generally should be awarded back pay; back pay should be denied only where the reasons for denial, if applied generally, would not frustrate the central purposes of the act to eliminate discrimination and to make whole the victim of discrimination (MCL 423.307[h]; MSA 17.458[7][h], repealed by 1976 PA 453, MCL 37.2101 et seq.; MSA 3.548[101] et seq.).*

2. CIVIL RIGHTS — EMPLOYMENT DISCRIMINATION — FAIR EMPLOYMENT PRACTICES ACT — BACK PAY.

   *Denial of back pay upon finding that an employee was a victim of unlawful discrimination on the ground that the discrimination was not purposeful and invidious in nature was inconsistent with the purposes of the Fair Employment Practices Act; the act did not seek to eliminate only purposeful and invidious discrimination, but all discrimination (MCL 423.307[h]; MSA 17.458[7][h], repealed by 1976 PA 453, MCL 37.2101 et seq.; MSA 3.548[101] et seq.).*

3. CIVIL RIGHTS — EMPLOYMENT DISCRIMINATION — MITIGATION OF DAMAGES.

   *As a general rule, a wrongfully terminated employee seeking damages must accept employment either with a different employer or with the same employer in order to mitigate damages if the job is unconditional except as to back pay; nonetheless, where an employer refuses to allow an employee to return to*

*work unless that employee complies with an unlawful discriminatory condition of employment, the employee has not failed to mitigate damages.*

OPINION BY RYAN, J.

4. CIVIL RIGHTS — EMPLOYMENT DISCRIMINATION — BACK PAY.

*Back pay should be awardable only where an employee is discharged for refusal to comply with a discriminatory condition of employment, and not where employment is terminated because of the employee's resignation.*

SEPARATE OPINION BY LEVIN, J.

5. CIVIL RIGHTS — EMPLOYMENT DISCRIMINATION — CONSTRUCTIVE DISCHARGE — BACK PAY.

*An employee who is not formally discharged and who declines to work under an unlawful working condition may be awarded back pay if the working condition is so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign; under such conditions, the employee is deemed to have been constructively discharged; however, where the working condition, although unlawful, is not difficult or unpleasant, the employee is not deemed to have been constructively discharged and, while ordinarily entitled to reinstatement, is not entitled to back pay.*

6. CIVIL RIGHTS — EMPLOYMENT DISCRIMINATION — MITIGATION OF DAMAGES.

*An employee who is instructed to work under an unlawful discriminatory condition has the burden, unless the condition is so difficult or unpleasant that a reasonable person would feel compelled to resign, to endure, at least temporarily, a perceived injustice while challenging the condition.*

*Frank J. Kelley,* Attorney General, *Louis J. Caruso,* Solicitor General, *Felix E. League, Jack Blumenkopf,* and *Michael J. Moquin,* Assistant Attorneys General, for plaintiff Department of Civil Rights.

*Starr, Bissell & Hackett* (by *H. James Starr*) for plaintiff Cornell.

*Foster, Swift, Collins & Coey, P.C.* (by *John L.*

*Collins, George M. Brookover,* and *Frank J. Nerat, Jr.),* for the defendant.

Amici Curiae:

*Miller, Cohen, Martens & Sugerman, P.C.* (by *John A. Obee),* and *Richard M. Goodman, P.C.* (by *Susan E. Lister),* for Michigan Trial Lawyers Association.

*Schaden & Heldman* (by *Victoria C. Heldman)* for Women Lawyers Association of Michigan.

WILLIAMS, C.J.

## I. INTRODUCTION

This case presents two issues for determination by this Court which it has not previously considered. The first issue is what standard should be applied in determining whether to award back pay to a civil rights claimant under § 7(h) of the Fair Employment Practices Act, MCL 423.307(h); MSA 17.458(7)(h), where the employer refuses to permit the claimant to return to work unless she complies with a discriminatory dress code. The second issue is whether a civil rights claimant is entitled to attorney fees under the successor to the Fair Employment Practices Act, the Civil Rights Act, MCL 37.2605(2)(i), (j); MSA 3.548(605)(2)(i), (j), which specifically provides for such fees, where the charge was filed three days prior to the effective date of the Civil Rights Act and the repeal of the Fair Employment Practices Act, which does not provide for attorney fees.

We conclude that back pay should generally be awarded where there has been a finding of unlawful discrimination. Given such a finding, back pay should only be denied for reasons, which if applied

generally, would not frustrate the statutory purposes of the Fair Employment Practices Act. The statutory purposes were twofold: first, to eliminate the last vestiges of discrimination, and, second, to make whole those who have suffered from discrimination. On the record before us, we find that the trial court denied back pay for reasons that would frustrate both of the above central statutory purposes.

With respect to attorney fees, we find ourselves unable to reach this issue. Claimant Cornell has precluded review by this Court inasmuch as she failed to raise the issue before the Civil Rights Commission, failed to appeal from the commission's ruling, and raised the issue before the circuit court on a different ground without any real accompanying argument.

We reverse the judgment of the Court of Appeals as to back pay, and affirm its judgment as to attorney fees.

## II. FACTS

Starrla K. Cornell filed a complaint with the Department of Civil Rights against Edward W. Sparrow Hospital Association on or about May 5, 1976. The department issued a charge against the hospital on March 28, 1977. Hearings were conducted before a referee on May 5, 6, 12 and 13, 1977. The hearing referee issued findings and recommendations in favor of the hospital.

On May 23, 1978, the Civil Rights Commission issued an order rejecting the findings and recommendations of the referee and adopting the opinion issued by Commissioner Paul H. Harbrecht, finding in favor of Ms. Cornell. Among other things, the claimant was awarded back pay. No mention was made of attorney fees.

Only Sparrow Hospital filed a claim of appeal in the Ingham Circuit Court on June 19, 1978. The circuit judge, reviewing the matter de novo, affirmed the ruling of the commission in all respects, except that he denied lost wages, benefits, and attorney fees. Reconsideration was denied.

Ms. Cornell and the Department of Civil Rights appealed to the Court of Appeals. In a two to one decision, the Court of Appeals affirmed the circuit court. *Dep't of Civil Rights v Sparrow Hospital Ass'n,* 119 Mich App 387; 326 NW2d 519 (1982). Rehearing was denied in a two to one decision. This Court denied the applications for leave filed by Ms. Cornell and the department. On reconsideration, this Court granted leave to appeal.

Starrla Cornell was employed by Sparrow Hospital as a histotechnologist from July 1, 1972 until May 3, 1976, when she was told not to report to work without complying with what was later declared to be a discriminatory dress code. The dress code required female technologists to wear a full white or pastel-colored uniform, including certain shoes, socks, underclothing, dresses, or pantsuits. In addition, female technologists were admonished to wear skirts of "respectable length" and accessories "appropriate for the situation." Male technologists, on the other hand, were permitted to wear a white laboratory coat over ordinary street clothing. The laboratory director testified that the dress code was justified because patients were used to seeing males dressed like doctors and females dressed like nurses.

The Department of Civil Rights introduced expert testimony regarding the effects of the discriminatory dress code on the female lab technicians at Sparrow Hospital. One social psychologist testified that the code reinforced negative stereotypes that

females "must be told what to do," and gave them a "sense of inferiority that makes them function less effectively" in the workplace. Another social psychologist testified that requiring female lab technicians to wear a kind of uniform that implied they were of lower status than the male lab technicians increased the psychological burden on the females. Additional testimony established that the female uniform was more costly and less convenient than that required of males.

This dress code was instituted on May 1, 1976. Ms. Cornell reported to work at least twice wearing clothing inconsistent with that required for females under the code, but acceptable for male employees of her status. She was sent home on each occasion, and, as noted above, told not to return to work without proper attire in accordance with the code.

## III. BACK PAY

This issue involves Ms. Cornell's right to back pay, where Sparrow Hospital refused to permit her to report for work unless she wore a specific uniform only required for females. This dress code was found by the Civil Rights Commission to be violative of the Fair Employment Practices Act, MCL 423.301 *et seq.;* MSA 17.458(1) *et seq.* (repealed and superseded by the Civil Rights Act, MCL 37.2101 *et seq.;* MSA 3.548[101] *et seq.*), which, inter alia, declared it to be an unfair labor practice "[f]or any employer . . . because of the sex of any individual, to refuse to hire or otherwise to discriminate against him with respect to hire, tenure, terms, conditions or privileges of employment."    MCL    423.303a(a);    MSA

17.458(3a)(a).[1] Under the Fair Employment Prac-
tices Act, where the commission determined that
the respondent has engaged in an unfair employ-
ment practice:

> [T]he commission *shall* state its findings of fact
> and *shall* issue and cause to be served on such
> respondent an order requiring such respondent to
> cease and desist from such unfair employment
> practice and *to take such further affirmative or
> other action as will effectuate the purposes of this
> act, including, but not limited to, hiring, reinstate-
> ment or upgrading of employees with or without
> back pay,* or admission or restoration to union
> membership, including a requirement for reports
> of the manner of compliance. Upon the submission
> of such reports of compliance, the commission may
> issue a declaratory order stating that respondent
> has ceased to engage in unfair employment prac-
> tices. [MCL 423.307(h); MSA 17.458(7)(h). Emphasis
> added.]

The Civil Rights Commission in this case or-
dered, inter alia, that the claimant be reinstated
with back pay. The circuit court reversed the
award of back pay because "[t]he dress code, as
instituted, does not amount to such purposeful and
invidious discrimination as to prohibit the attain-

[1] The comparable provision in the Civil Rights Act is MCL
37.2202(1); MSA 3.548(202)(1). The charge issued here by the Civil
Rights Department was filed three days before the effective date of
the Civil Rights Act and the repeal of the Fair Employment Practices
Act. As such, all proceedings in this case, except for the filing of the
charge, occurred after the repeal of the Fair Employment Practices
Act. Nonetheless, the parties, courts and the civil rights hearing
referee and commission have proceeded throughout this litigation
under the Fair Employment Practices Act. We do not decide the
propriety of proceeding under that act. For purposes of our discussion
in this case, we note that the back pay provision of the Civil Rights
Act, MCL 37.2605; MSA 3.548(605), is in all relevant respects, lan-
guage, history and purpose, the same as that present in its predeces-
sor, the Fair Employment Practices Act, MCL 423.307(h); MSA
17.458(7)(h).

ment of gainful employment." The Court of Appeals affirmed that decision. We disagree and reverse.

The issue involving the back-pay provision of the Fair Employment Practices Act is one of first impression in this Court. In fact, there is little or no guiding precedent on this issue in Michigan. The federal courts, on the other hand, have had far more experience with a comparable provision of the federal Civil Rights Act of 1964, 42 USC 2000e-5(g). That provision reads:

> If the court finds that the respondent has intentionally engaged in or is intentionally engaging in an unlawful employment practice charged in the complaint, the court *may* enjoin the respondent from engaging in such unlawful employment practice, and *order such affirmative action as may be appropriate, which may include, but is not limited to, reinstatement or hiring of employees, with or without back pay* (payable by the employer, employment agency, or labor organization, as the case may be, responsible for the unlawful employment practice), or any other equitable relief as the court deems appropriate. Back pay liability shall not accrue from a date more than two years prior to the filing of a charge with the Commission. Interim earnings or amounts earnable with reasonable diligence by the person or persons discriminated against shall operate to reduce the back pay otherwise allowable. No order of the court shall require the admission or reinstatement of an individual as a member of a union, or the hiring, reinstatement, or promotion of an individual as an employee, or the payment to him of any back pay, if such individual was refused admission, suspended, or expelled, or was refused employment or advancement or was suspended or discharged for any reason other than discrimination on account of race, color, religion, sex, or national origin or in violation of section 2000e-3(a) of this title. [Emphasis added.]

The preeminent federal case construing 42 USC 2000e-5(g) is *Albemarle Paper Co v Moody,* 422 US 405; 95 S Ct 2362; 45 L Ed 2d 280 (1975). Although federal case law is not binding on us here, we find the *Albemarle* reasoning compelling. See *Civil Rights Comm v Chrysler Corp,* 80 Mich App 368, 375, n 4; 263 NW2d 376 (1977).

A. *Albemarle*

In *Albemarle,* a class action was brought on behalf of present and former black employees of the Albemarle Paper Company, alleging certain violations of Title VII of the federal Civil Rights Act, with respect to the company's seniority system and its program of employment testing. One of the primary issues before the United States Supreme Court on certiorari was:

> When employees or applicants for employment have lost the opportunity to earn wages because an employer has engaged in an unlawful discriminatory employment practice, what standards should a federal district court follow in deciding whether to award or deny backpay? [*Albemarle, supra,* p 408.]

The *Albemarle* Court noted that 42 USC 2000e-5(g) used the term "may" in authorizing an award of back pay, and hence concluded that any award was discretionary. Since an award of back pay is discretionary and a form of restitution, the award is also equitable in nature, see *Curtis v Loether,* 415 US 189, 196-197; 94 S Ct 1005; 39 L Ed 2d 260 (1974), and " 'equity eschews mechanical rules . . . [and] depends on flexibility.' " *Albemarle, supra,* p 417, quoting *Holmberg v Armbrecht,* 327 US 392, 396; 66 S Ct 582; 90 L Ed 743 (1946). Despite the discretionary/equitable nature of the award, however, the *Albemarle* Court opined that the author-

ity to grant or deny such an award was far from unlimited:

> [S]uch discretionary choices are not left to a court's "inclination, but to its judgment; and its judgment is to be guided by sound legal principles." *United States v Burr,* 25 F Cas 30, 35 (No 14,692d) (CC Va 1807) (Marshall, C.J.). The power to award backpay was bestowed by Congress, as part of a complex legislative design directed at a historic evil of national proportions. A court must exercise this power "in light of the large objectives of the Act," *Hecht Co v Bowles,* 321 US 321, 331 [64 S Ct 587; 88 L Ed 754] (1944). That the court's discretion is equitable in nature, see *Curtis v Loether,* 415 US 189, 197 [94 S Ct 1005; 39 L Ed 2d 260] (1974), hardly means that it is unfettered by meaningful standards or shielded from thorough appellate review.

> \* \* \*

> [W]hen Congress invokes the Chancellor's conscience to further transcendent legislative purposes, what is required is the principled application of standards consistent with those purposes and not "equity [which] varies like the Chancellor's foot." [Eldon, L.C., in *Gee v Pritchard,* 2 Swans *403, *414, 36 Eng Rep 670, 674 (1818).] Important national goals would be frustrated by a regime of discretion that "produce[d] different results for breaches of duty in situations that cannot be differentiated in policy." *Moragne v States Marine Lines,* 398 US 375, 405 [90 S Ct 1772; 26 L Ed 2d 339] (1970). [*Albemarle, supra,* pp 416-417.]

In accordance with the foregoing, the *Albemarle* Court held that a trial court's decision to award or deny back pay must be measured against the purposes of Title VII.

The primary purpose of Title VII was to achieve equality of employment opportunities and remove barriers that have operated to favor one identifia-

ble group over another. Back pay is connected with this objective because it provides a catalyst for employers to self-examine and self-evaluate their practices in an effort to eliminate discrimination. *Albemarle, supra,* pp 417-418.

The Court also found that Title VII embodied a "make whole" purpose, to make persons whole for injuries suffered due to unlawful employment discrimination. This "make whole" purpose was evidenced by the fact that Congress had armed the courts with full equitable powers, whose historic purpose was to " 'secure complete justice,' *Brown v Swann,* 10 Pet 497, 503 (1836); see also *Porter v Warner Holding Co,* 328 US 395, 397-398 [66 S Ct 1086; 90 L Ed 1332] (1946)." *Albemarle, supra,* p 418. Moreover, the *Albemarle* Court stated that Title VII dealt with injuries of an economic nature and that in such cases the courts should attempt to place the injured party in as near the same position the party would have occupied had this wrong not been committed. Finally, the Court noted that the "make whole" purpose was supported by the legislative history of Title VII. The back-pay provision of Title VII was modeled on the back-pay provision of the National Labor Relations Act, under which the National Labor Relations Board has consistently awarded back pay as a matter of course. The *Albemarle* Court stated that it must assume that Congress was aware of this fact. *Albemarle, supra,* pp 418-421.

Thus, the two central statutory purposes of Title VII as set forth in *Albemarle* are to eliminate discrimination and make persons whole for injuries suffered through discrimination. The *Albemarle* Court held that "given a finding of unlawful discrimination, backpay should be denied only for reasons which, if applied generally, would not frustrate the central statutory purposes . . . ."

*Albemarle, supra,* p 421. On the basis of this standard, the *Albemarle* Court concluded that the employees were entitled to back pay.

## B. *Albemarle & Section 7(h) of the Fair Employment Practices Act*

We think that the *Albemarle* standard should be the standard under § 7(h) of the Fair Employment Practices Act. In fact, we agree with dissenting Judge MACKENZIE in the Court below that "the case for a result such as the Court reached in *Albemarle* is more compelling under the state statute than under the federal statute." *Dep't of Civil Rights v Sparrow Hospital Ass'n, supra,* p 395 (MACKENZIE, J., *dissenting*).

The operative section of the federal Title VII reads, "the court *may* . . . order such affirmative action as may be appropriate, which *may* include . . . reinstatement . . . with or without back pay . . . ." 42 USC 2000e-5(g). Such language is clearly discretionary. Section 7(h) of the state Fair Employment Practices Act, on the other hand, reads, "the commission *shall* . . . take such further affirmative or other action *as will effectuate the purposes of this act,* including . . . reinstatement . . . with or without back pay . . . ." The "with or without" language in § 7(h) imparts some sense of discretion. However, that discretion, by the express terms of the statute, shall be exercised so as to effectuate the purposes of the act.

Furthermore, as in *Albemarle,* the power to award back pay was given by the Legislature as part of legislation that was directed at an historic evil. The Legislature bestowed this power on the commission to "further transcendent legislative purposes . . . ." *Albemarle, supra,* p 417. To permit inconsistent application of the back-pay provision would be to frustrate those purposes.

In accordance with the above discussion, we think that the decision to deny or grant back pay must be measured by the purposes of the Fair Employment Practices Act. We find that the purposes of the Fair Employment Practices Act, like Title VII, were to eradicate discrimination and to make persons whole for injuries suffered as a result of discrimination.

The purpose of eradicating discrimination is clearly stated in the act itself. At the time this action was commenced, the preamble to the Fair Employment Practices Act read in pertinent part, "AN ACT to promote and protect the welfare of the people of this state *by prevention and elimination of discriminatory employment practices and policies . . . .*" Preamble, MCL 423.301 *et seq.;* MSA 17.458(1) *et seq.,* as amended by 1976 PA 52 (emphasis added).[2]

In fact, this Court has forthrightly and consistently recognized this purpose in construing the Fair Employment Practices Act and its successor the Civil Rights Act. See *Boscaglia v Michigan Bell Telephone Co,* 420 Mich 308, 314-316; 362 NW2d

---

[2] As originally enacted, the preamble to the Fair Employment Practices Act read in pertinent part, "AN ACT to promote and protect the welfare of the people of this state *by prevention and elimination of discriminatory employment practices and policies . . . .*" Preamble, MCL 423.301 *et seq.;* MSA 17.458(1) *et seq.* (before 1975 amendment, 1975 PA 332). (Emphasis added.) The preamble was amended in 1975 to read, "AN ACT to promote and protect the welfare of the people of this state *by prevention and elimination of unfair practices and policies in employment . . . .*" Preamble, MCL 423.303 *et seq.;* MSA 17.458(3) *et seq.,* as amended by 1975 PA 332. (Emphasis added.) The meaning of "unfair practices . . . in employment . . ." can be gleaned from the act itself which defines "unfair employment practice" throughout the act as discrimination. See MCL 423.303, 423.303a; MSA 17.458(3), 17.458(3a). In 1976, the preamble was amended to read much the same as it did originally and as it did read at the time this action was commenced, "AN ACT to promote and protect the welfare of the people of this state *by prevention and elimination of discriminatory employment practices and policies . . . .*" Preamble, MCL 423.301 *et seq.;* MSA 17.458(1) *et seq.,* as amended by 1976 PA 52 (emphasis added).

642 (1984); *Miller v C A Muer Corp,* 420 Mich 355, 362-363; 362 NW2d 650 (1984); *Highland Park v Fair Employment Practices Comm,* 364 Mich 508, 512; 111 NW2d 797 (1961). We reiterate and emphasize that dominant purpose.

Like Title VII, a second major purpose of the act was to make whole those who suffered injury on account of discriminatory practices. As previously noted, the *Albemarle* Court pointed out that Title VII armed the courts "with full equitable powers . . ." and that "it is the historic purpose of equity to 'secur[e] complete justice . . . .' " *Albemarle, supra,* p 418, quoting *Brown v Swann, supra,* p 503. This historic purpose was part of the Fair Employment Practices Act because, much the same as Title VII, the Fair Employment Practices Act bestowed upon the commission a full array of powers that were equitable in nature. See MCL 423.307; MSA 17.458(7). *Albemarle, supra,* p 418, quoting *Brown v Swann, supra,* p 503. The Fair Employment Practices Act also dealt with injuries that were largely economic in nature, and as the Court stated in *Albemarle,* in such situations "[t]he injured party is to be placed, as near as may be, in the situation he would have occupied if the wrong had not been committed." *Albemarle, supra,* pp 418-419, quoting *Wicker v Hoppock,* 6 Wall 94, 99; 18 L Ed 752 (1867).

In addition, § 7(h) of the Fair Employment Practices Act, like the back-pay provision of Title VII, was modeled on the corresponding National Labor Relations Act provision, *Boscaglia v Michigan Bell Telephone Co, supra,* p 316, n 12. See *Highland Park v Fair Employment Practices Comm, supra,* pp 516-517. Pursuant to that provision, the National Labor Relations Board has awarded back pay as a matter of course. *Albemarle, supra,* pp 419-420. We must assume that the Legislature was

aware of this fact when it enacted the back-pay provision of the Fair Employment Practices Act. *Albemarle, supra,* pp 419-420. See 2A Sands, Sutherland Statutory Construction (4th ed), § 52.02.

We conclude that § 7(h) of the Fair Employment Practices Act had a twofold purpose, to eliminate discrimination and to make whole those who have suffered through discrimination. Thus, following a finding of unlawful discrimination, back pay should not be denied except for reasons which, if applied generally, would not defeat these two central purposes.[3]

C. *Award of Back Pay in the Instant Case*

The trial court applied an incorrect standard in deciding whether to award back pay to the claimant. The trial court refused to award back pay because the dress code did not amount "to such purposeful and invidious discrimination as to prohibit the attainment of gainful employment."[4] However, the act does not seek to eliminate only "purposeful and invidious" discrimination, but all discrimination. Therefore, the question whether the discrimination is of a purposeful or invidious nature is not controlling.

An award of back pay serves two purposes. First, it encourages employers to examine and evaluate conditions of employment with an eye toward eliminating those which have discriminatory effects. *Albemarle, supra,* pp 417-418, 422. This purpose is not served if back pay is awarded only against employers who "purposefully and invidi-

---

[3] While, in a situation such as that present here, our ruling applies in the first instance to the award of the commission, it is equally applicable to the reviewing courts subject to the proper reviewing standard. In this light, whenever the commission or court declines to award back pay, it is necessary to articulate the reasons therefor. See *Albemarle, supra,* p 421, n 14.

[4] We make no comment regarding whether or not the hospital's discriminatory dress code was purposeful or invidious.

ously" impose discriminatory conditions. The unwitting discriminator is equally in need of an incentive to undergo self-evaluation.

The second purpose of the back-pay award is to compensate a claimant for economic losses suffered as a result of discriminatory practices. Such losses exist without regard to the attitude with which the employer imposes the discriminatory working conditions. Awarding back pay only for purposeful and invidious discrimination thwarts this second purpose too.

The trial court in *Albemarle* denied back pay for a reason similar to that employed by the circuit court in this case. The Supreme Court of the United States rejected that basis as inconsistent with the purposes of the act:

> The District Court's stated grounds for denying backpay in this case must be tested against these standards. The first ground was that Albemarle's breach of Title VII had not been in "bad faith." This is not a sufficient reason for denying backpay. Where an employer *has* shown bad faith—by maintaining a practice which he knew to be illegal or of highly questionable legality—he can make no claims whatsoever on the Chancellor's conscience. But, under Title VII, the mere absence of bad faith simply opens the door to equity; it does not depress the scales in the employer's favor. *If backpay were awardable only upon a showing of bad faith, the remedy would become a punishment for moral turpitude, rather than a compensation for workers' injuries.* This would read the "make whole" purpose right out of Title VII, for a worker's injury is no less real simply because his employer did not inflict it in "bad faith." Title VII is not concerned with the employer's "good intent or absence of discriminatory intent" for "Congress directed the thrust of the Act to the *consequences* of employment practices, not simply the motivation." *Griggs v Duke Power Co,* 401 US [424,] 432

[91 S Ct 849; 28 L Ed 2d 158 (1971)]. See also *Watson v City of Memphis,* 373 US 526, 535 [83 S Ct 1314; 10 L Ed 2d 529] (1963); *Wright v Council of City of Emporia,* 407 US 451, 461-462 [92 S Ct 2196; 33 L Ed 2d 51] (1972). [Emphasis added. *Albemarle, supra,* pp 422-423. See *Albemarle, supra,* p 422, n 16; *MERC v Reeths-Puffer School Dist,* 391 Mich 253, 266-267; 215 NW2d 672 (1974).]

Like the United States Supreme Court, we reject the trial court's denial of back pay on the basis of the hospital's alleged "good faith." We find that denial of back pay to this claimant would defeat the central purposes of the act.

Sparrow Hospital argues that the circuit court's denial of back pay was justified because the claimant failed to mitigate her damages by continuing work at Sparrow Hospital. The hospital argues that the claimant should have mitigated her damages by complying with the discriminatory dress code while simultaneously challenging its validity.[5] The circuit court seems to have shared this same opinion.

The hospital points out that the United States Supreme Court in *Ford Motor Co v EEOC,* 458 US 219, 236; 102 S Ct 3057; 73 L Ed 2d 721 (1982), held that under Title VII, the duty to mitigate requires a wronged individual to accept a subsequent offer of employment from the wrongdoing employer. What the hospital fails to note is that the Supreme Court held that although the offer of employment need not include back pay, it must otherwise be "unconditional." Here the hospital's "offer of employment" was not unconditional. Rather, it was specifically conditioned upon Ms.

_____

[5] The record discloses testimony by the plaintiff that she sought employment elsewhere in an attempt to mitigate damages. However, no finding on the question of general mitigation of damages was made below.

Cornell's compliance with an unlawful discriminatory dress code.

Furthermore, the hospital's position is wholly inconsistent with the purposes of the act. Although the claimant was justified in not complying with the unlawful discriminatory dress code, and thereby denied employment, she would not be made whole for her injuries. Likewise, the employer would not be encouraged to examine its policies with an eye toward eliminating discrimination. The hospital's position would encourage employees to comply with discriminatory practices established by employers, not encourage employers to eradicate such practices.

Ms. Cornell was ready, willing, and able to work at all times. She simply refused to comply with the unlawful discriminatory dress code. Ms. Cornell's supervisor refused to allow her to return to work unless she complied with the code, and, when she did not do so, her employment was terminated. While as a general rule, a wrongfully terminated employee seeking damages must accept employment to mitigate damages, either with a different employer or with the same employer, if the job is unconditional except as to back pay, nonetheless, where an employer refuses to allow an employee to return to work unless that employee complies with an unlawful discriminatory condition of employment, the employee has not failed to mitigate damages.

The hospital argues that the federal doctrine of constructive discharge prevents Ms. Cornell from receiving an award of back pay. Under that doctrine, an employee who voluntarily quits employment may be deemed "constructively discharged," and hence eligible for back pay only when "working conditions . . . have [become] so difficult or unpleasant that a reasonable person in the em-

ployee's shoes would have felt compelled to resign." *Bourque v Powell Electrical Mfg Co,* 617 F2d 61, 65 (CA 5, 1980), quoting *Alicea Rosado v Garcia Santiago,* 562 F2d 114, 119 (CA 1, 1977). Courts generally deem the fact of discrimination alone insufficient to justify voluntary quitting, in order to encourage employees to attack discriminatory working conditions within the context of a continuing employment relationship. *Bourque, supra,* p 66.

We are not inclined to address the question whether Ms. Cornell was constructively discharged because the facts indicate that she was actually discharged. As stated above, she was ready, willing, and able to work at all times. The findings of fact of both the hearing referee and the Civil Rights Commission included statements that the dress code was made a condition of Ms. Cornell's employment at the hospital and that Ms. Cornell "was terminated and prevented from working as the result of her failure to comply" with the requirements of the dress code. In light of the fact-finding of the administrative tribunals and lower courts, we accept the finding that the hospital discharged Ms. Cornell for refusing to comply with the discriminatory dress code.[6] See also *EEOC v Sage Realty Corp,* 507 F Supp 599, 608, 613 (SD NY, 1981).

However, even under the doctrine of constructive discharge we would find Ms. Cornell eligible for back pay because a reasonable employee in her situation would have felt compelled to resign. Sparrow Hospital imposed two different dress codes on its laboratory technologists, a male dress

[6] The circuit court's findings stated that Ms. Cornell "was sent home and told that unless she adhered to the new policy she would be terminated." The Court of Appeals opinion stated, "When Cornell refused to conform her appearance to the provisions of the dress code, she was discharged." 119 Mich App 387, 390; 326 NW2d 519 (1982).

code and a female dress code. The codes were intentionally designed to reinforce sexual stereotypes: men were dressed to look like doctors, and women were dressed to look like nurses.

Ms. Cornell complained about the discriminatory nature of the dress code to a member of the committee responsible for designing the codes and to her supervisor several times before the codes became effective. Cornell complied with the male dress code after the codes became effective. She again called her supervisor's attention to the discriminatory nature of the dress code when the supervisor called her away from her work station and sent her home to change clothes. In light of the obviously demeaning nature of the dress code and of her employer's unwillingness to reexamine its dress code, it was reasonable for Ms. Cornell not to return to work. We therefore find that under the doctrine of constructive discharge, Ms. Cornell is entitled to receive back pay.

We also reject several aspects of the minority's analysis of the constructive-discharge doctrine. The minority opinion justifies the denial of back pay under the constructive-discharge doctrine for at least two reasons. First, management's ability to manage is impaired when the threat of back pay makes it unable to enforce employment conditions which are arguably discriminatory. Second, emotional distress damages may be available to compensate the victim of discriminatory employment conditions for the period in which the illegal condition was tolerated.

These justifications are inadequate and fundamentally undermine the intent underlying the Civil Rights Act. The minority concludes that the analysis it applies "is beneficial to both employers and employees." *Post,* p 584. This is because, the minority argues,

.

The employer cannot . . . be made whole retro-
actively. Requiring the employer . . . not [to] en-
forc[e] a rule whenever an employee considers it
discriminatory . . . would impair management's
ability to manage. In large plants, the result could
be disruptive. *Post,* pp 585–586.


No evidence of such "disruption" and "serious
impairment" in businesses liable for back-pay
awards was produced in this case. Certainly the
present case demonstrates the very opposite. Un-
less the very essence of management is the ability
to impose discriminatory working conditions upon
employees, it is difficult to imagine any harm
whatsoever, let alone "disruption," Sparrow Hospi-
tal would have suffered from not introducing and
enforcing its newly adopted dress code. Thus, this
is not the case in which to address the problems of
"disruption" and "management's ability to man-
age," assuming they exist.

On the other hand, the minority states, "[i]f the
employee stays on despite the discriminatory con-
dition, the employee can ordinarily be 'made
whole' retroactively." *Post,* p 585. Yet, as the
minority concedes in a footnote, *post,* p 585,
this Court has never held that mental distress
damages are recoverable for employment discrimi-
nation. Thus, in fact, the minority is relying on a
remedy with which to make the employee whole
which may not be available at all. *Boscaglia v
Michigan Bell, supra,* p 316, n 13; *Kewin v Massa-
chusetts Mutual Life Ins Co,* 409 Mich 401; 295
NW2d 50 (1980); *Daley v LaCroix,* 384 Mich 4; 179
NW2d 390 (1970).

Indeed, as the minority concedes, under its ap-
proach, unless mental distress damages are recov-
erable, "a worker who remains on the job would

receive nothing for successfully challenging an unlawful discriminatory condition." *Post,* p 585. Implicit in this acknowledgment is, of course, the recognition that the employer who illegally discriminates is subject to no more than a declaratory judgment that its policy is illegal, or, at worst, to an injunction against continuing the practice. Thus, the minority's analysis removes "the spur or catalyst which causes employers . . . to self-examine and to self-evaluate their employment practices and to endeavor to eliminate, so far as possible, the last vestiges . . ." of discrimination, *Albemarle Paper Co v Moody, supra,* pp 417-418, quoting *United States v N L Industries, Inc,* 479 F2d 354, 379 (CA 8, 1973). Not only does the minority's analysis eliminate employers' incentives to critically evaluate their employment practices and policies—it also eliminates all incentives for employers to cease and desist from a discriminatory practice once they recognize it as being illegal. Instead, they are encouraged to wait until the declaratory judgment of illegality becomes final— and, indeed, there is no reason for them not to simply institute a "new," slightly different, policy and let the employees go through the entire court-process all over again. In fact, the minority's analysis is an incentive, an encouragement, to employers to continue to discriminate.

In addition, vulnerability to mental distress damages is far more likely to be disruptive to management than vulnerability to back-pay awards. An award of back pay is a known, relatively easily calculable dollar figure. By contrast, the award of mental distress damages will vary widely from individual to individual and, no doubt, from jury to jury. Management can calculate the financial risk of imposing an arguably discriminatory condition far more accurately when back pay,

and not mental distress damages, is an available remedy.

An employee who resigns because of an arguably discriminatory condition of employment will not be assured a windfall in the form of back pay if a court later finds that the condition was illegal. The employee is always under a *general* duty to mitigate damages by seeking other employment, as mentioned above at footnote 5.

We conclude that the trial judge improperly overturned the commission's award of back pay.

### IV. Attorney Fees

Ms. Cornell argues that attorney fees should have been awarded by the circuit court and commission under the Civil Rights Act. MCL 37.2605(2)(i), (j); MSA 3.548(605)(2)(i), (j). The claimant admits that her action was filed under the Fair Employment Practices Act before the effective date of the Civil Rights Act, March 31, 1977. She argues, however, that the attorney fees provision of the Civil Rights Act should be held to be retroactive because it is remedial in nature. We find ourselves unable to reach the merits of the claimant's argument because she has failed to preserve the issue for review.

The Fair Employment Practices Act clearly did not provide for attorney fees, while the Civil Rights Act clearly does, MCL 37.2605(2)(i), (j); MSA 3.548(605)(2)(i), (j). Ms. Cornell filed a complaint against Sparrow Hospital under the Fair Employment Practices Act on or about May 5, 1976 with the Civil Rights Department. That department issued a charge against the hospital under the Fair Employment Practices Act on March 28,

1977. This was three days before the effective date of the Civil Rights Act.

Hearings were conducted before a referee on May 5, 6, 12 and 13, 1977, and he issued his findings and recommendations soon thereafter. These findings and recommendations were substantially rejected by the Civil Rights Commission by final order dated May 23, 1978. Only the hospital sought appeal to the circuit court on June 19, 1978.

Although the Civil Rights Act was in effect during all proceedings before the Civil Rights Commission except the actual filing of the complaint, the issue of attorney fees was never raised.[7] In fact, the order of the commission does not even address the issue one way or the other.

Moreover, Ms. Cornell never filed an appeal from the order of the commission. Instead, she simply requested attorney fees along with her request for other relief, citing § 7(h) of the Fair Employment Practices Act. MCL 423.307(h); MSA 17.458(7)(h). No claim for attorney fees was made under the Civil Rights Act, nor did the claimant raise any issue regarding the retroactive application of the Civil Rights Act's attorney fees provision to the award of the commission. It was not until the claimant sought review in the Court of Appeals that she claimed a right to attorney fees under the Civil Rights Act.

Thus, the claimant failed to raise the issue before the commission, failed to appeal from the

---

[7] We note that we do not have the complete record of the proceedings before the commission. However, Ms. Cornell does not deny the hospital's assertion that the issue of attorney fees was never raised. In fact, during oral argument counsel for Ms. Cornell conceded as much. Moreover, the hospital's assertion is supported by the commission's opinion which makes no mention of attorney fees.

commission's ruling,[8] and raised the issue before the circuit court under a different theory without any real accompanying argument. For these reasons, this issue is not reviewable on appeal. See *Turner v Consumers Power Co,* 376 Mich 188, 191-192; 136 NW2d 1 (1965); *Odoi v White,* 342 Mich 573, 577; 70 NW2d 709 (1955); *Dwelley v Tom McDonnell, Inc,* 334 Mich 229, 233; 54 NW2d 217 (1952).

## V. CONCLUSION

We hold that given a finding of unlawful discrimination under the Fair Employment Practices Act, back pay should only be denied to a claimant for reasons which, if applied generally, would not frustrate the central purposes of the act. The two main purposes of the act were to eliminate discrimination and make whole those who suffered injury on account of discrimination. Denial of back pay under the facts of this case would frustrate both of these purposes.

With respect to attorney fees, Ms. Cornell has precluded review by this Court because she has failed to properly preserve the issue for appellate review.

In accordance with the foregoing, we reverse the judgment of the Court of Appeals as to back pay and affirm the judgment of that Court as to attorney fees. We remand to the circuit court for determination of the amount of back pay and mitigation.

CAVANAGH and BOYLE, JJ., concurred with WILLIAMS, C.J.

---

[8] The fact that the circuit court's review is de novo does not absolve the claimant of the responsibility to raise the issue before the commission and seek an appeal therefrom in order to preserve that issue for appellate review. See *Alford v Lehman,* 350 Mich 446, 457-458; 86 NW2d 330 (1957).

RYAN, J. (*concurring*). I concur with the plurality's determination that appellant Cornell was fired for her refusal to comply with the discriminatory dress code and that she is entitled to back pay. However, I cannot subscribe to a number of statements in my brother's plurality opinion and, therefore, I concur separately.

Specifically, I do not agree with the criticism of the rationale that underlies the doctrine of constructive discharge. The constructive-discharge doctrine performs the useful function among others of weeding out frivolous claims.[1] In a proper case, it may be appropriate for this Court to adopt the constructive-discharge doctrine as the standard to be used to determine whether back pay is due an employee who has voluntarily resigned. This is not such a case.

Additionally, I concur with the award of back pay to Ms. Cornell, but only to the extent that she was determined to have been fired. Some of the language of the plurality opinion suggests, in dicta, that back pay should ordinarily be awarded whether the employment is terminated by discharge or by resignation. I do not concur in this broad language. I agree with the plurality only to the extent that it would hold that, save for exceptionable circumstances not presented in this case, back pay is awardable *when an employee is discharged* for refusal to comply with a discriminatory condition of employment.

---

[1] See, *e.g., Junior v Texaco,* 688 F2d 377 (CA 5, 1982) (constructive-discharge claim dismissed where employee voluntarily resigned after he received a low performance evaluation; working conditions were more than tolerable); *Nolan v Cleland,* 482 F Supp 668; 55 ALR Fed 411 (ND Cal, 1979) (constructive-discharge claim dismissed; resignation was not the product of duress where employee accepted other employment prior to resignation); *Neale v Dillon,* 534 F Supp 1381 (ED NY, 1982) (no constructive discharge where employee's resignation was not the product of an intolerable work situation, but rather her own personal embarrassment at being passed over for promotion).

RILEY, J., concurred with RYAN, J.

BRICKLEY, J. (*concurring*). I concur with the result of the plurality, but write separately to express agreement with Justice LEVIN's separate opinion, adopting the standard that the complained-of discrimination must be "so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign" and requiring a constructive-discharge analysis.

I agree with the plurality in the awarding of back pay because I think the discriminatory action here offended this standard, resulting in a constructive discharge.

LEVIN, J. The issue is whether Starrla K. Cornell—who was asked "to go home again and change clothes" to comply with a dress code subsequently found to be discriminatory—is entitled to back pay.

The federal courts have developed an analysis for deciding when back pay should be awarded to an employee who is not formally discharged and who declines to work under an unlawful working condition.[1] The employee may be awarded back pay if the working condition is "so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." *Bourque v Powell Electrical Mfg Co*, 617 F2d 61, 65 (CA 5, 1980).[2] If the working condition is found to be so difficult or unpleasant, the employee is deemed to have been "constructively

---

[1] This Court and the Court of Appeals often follow federal precedent construing provisions of federal civil rights legislation containing language corresponding to this state's civil rights act. See *Boscaglia v Michigan Bell,* 420 Mich 308, 323; 362 NW2d 642 (1984).

[2] See also *Alicea Rosado v Garcia Santiago,* 562 F2d 114, 119-120 (CA 1, 1977).

discharged" and back pay is awarded. If the working condition is, although unlawful, not so difficult or unpleasant, the employee is not deemed to have been constructively discharged; the employee ordinarily is entitled to be reinstated but is not entitled to back pay.

The plurality says that the constructive-discharge doctrine only applies when the employee resigns. The plurality concludes that Cornell did not resign, that she was discharged. In the instant case this is a dubious distinction.

Cornell did not submit her resignation, and Sparrow did not discharge her. Instead, Sparrow indicated that Cornell's continued employment was conditioned on her submitting to the dress code. She was free to return, but on Sparrow's terms.

The constructive-discharge doctrine is not based on a distinction as narrow as whether the employer or the employee blinked. The constructive-discharge analysis applies whenever an employee is in a position to continue working and chooses not to do so. When an employer discharges an employee, the employee cannot mitigate damages by continuing to work for the employer. If the employee is not discharged, the employee ordinarily must, unless the unlawful discriminatory condition is so difficult or unpleasant, continue working while challenging the unlawful condition. Cornell was not discharged. She had the option of continued employment under discriminatory conditions.

The circuit court, which ordered Cornell reinstated but denied back pay, did not apply constructive-discharge analysis in reaching its decision denying back pay. I would remand to the circuit court for reconsideration of the back-pay decision, applying the correct mode of analysis.

I

Cornell began working for Sparrow as a histotechnologist in 1972. She worked in a laboratory receiving specimens, making slides, and assisting pathologists. Sparrow instituted a dress code, requiring women to wear white uniforms complete with white shoes and socks and underclothing "appropriate for the situation." Male employees doing the same work were only required to wear white lab coats. The purpose of the dress code, according to the laboratory director, was to please patients used to male employees dressed as doctors and female employees dressed as nurses. A committee of lab employees, male and female, had chosen the uniform.

Cornell complained about the differences between the male and female dress code to her representative on the committee and also to her supervisor. Her representative on the committee did not seem concerned about the difference between the uniforms. Her supervisor appears to have told her it was the committee's decision.

On the first day the dress code was in effect, Cornell worked until the afternoon. She was wearing street clothes and a lab coat. Her supervisor called her into his office and told her that she must comply with the dress code, and go home and change. She told him that she had communicated with an attorney. The supervisor suggested that she bring in her attorney to discuss the matter. The record does not indicate whether she did bring in her attorney. Two days later she returned without wearing the uniform. After twenty minutes, she was summoned to the supervisor's office. He told her, "I am going to have to ask you to go home again and change clothes." She left and never returned.

Cornell filed a complaint with the Michigan Department of Civil Rights, which found discrimination on the basis of sex and ordered reinstatement and back pay. The circuit court affirmed the finding of discrimination, but reversed the commission's order of back pay. The circuit court, in finding that Cornell was not entitled to back pay, characterized the conclusion of the employment relationship: "Claimant chose not to adhere to the code and thus terminated her employment."

The Court of Appeals affirmed, holding that back pay would not be ordered because there were no special circumstances justifying the award. The Court of Appeals characterized the termination of Cornell's employment differently, "When Cornell refused to conform her appearance to the provisions of the dress code, she was discharged."

## II

Sparrow does not challenge the determination that the dress code was discriminatory. Men and women performing the same work were treated differently for no apparent reason except "sexual stereotyping."[3] Cornell is entitled to reinstatement. Back pay is, however, a different matter.

An employee who, in the words of the circuit court, has "terminated her employment" may be entitled to back pay in the application of the constructive-discharge doctrine. A constructive discharge occurs when the challenged working condition is "so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." *Bourque, supra.* Stated somewhat differently, the employee must " 'mitigate damages by remaining on the job' unless that job

---

[3] *Civil Rights Dep't v Sparrow,* 119 Mich App 387, 391; 326 NW2d 519 (1982).

presents 'such an aggravated situation that a reasonable employee would be forced to resign.' " *Clark v Marsh,* 214 US App DC 350, 355; 665 F2d 1168 (1981).

### A

In *Bourque,* the United States Court of Appeals for the Fifth Circuit found discrimination, but no constructive discharge, where the female complainant was paid less than her male counterparts in the same position.[4]

In *Clark,* the United States Court of Appeals for the District of Columbia Circuit found discrimination and a constructive discharge where an employee with an excellent work record was "continuously spurned," receiving only one promotion in eleven years. In *Meyer v Brown & Root Construction Co,* 661 F2d 369 (CA 5, 1981), the United States Court of Appeals for the Fifth Circuit held that a woman was constructively discharged when, after telling her supervisor she was pregnant, she was transferred to duties that involved moving heavy equipment, thereby endangering her and her unborn child.[5]

The Court of Appeals has applied the constructive-discharge doctrine.[6]

---

[4] The Court held that, "discrimination manifesting itself in the form of unequal pay cannot, alone, be sufficient to support a finding of constructive discharge." 617 F2d 65.

[5] Conditions that would cause a reasonable employee to resign were also found where a white professor in a predominately black college was discriminated against and harassed on account of her race. At one point colleagues coerced students into signing a racially motivated petition that accused her of "delinquent" teaching habits and drinking on the job. *Lincoln v University System of Georgia Bd of Regents,* 697 F2d 928, 933 (CA 11, 1983).

[6] In *LeGalley v Bronson Community Schools,* 127 Mich App 482, 487; 339 NW2d 223 (1983), the Court of Appeals concluded that there was not a constructive discharge where "plaintiff failed to present evidence of onerous working conditions or of harassment."

In *Jenkins v American Red Cross,* 141 Mich App 785, 791, 797; 369

## B

A similar question may arise in the context of workplace safety. OSHA has sought to accommodate the competing concerns by promulgating a regulation which bars an employer from disciplining an employee who walks off the job if there is a real danger of death or serious injury.[7]

The United States Supreme Court sustained the validity of this regulation. *Whirlpool Corp v Marshall,* 445 US 1, 17; 100 S Ct 883; 63 L Ed 2d 154 (1980).

Although the harms engendered by discrimination and unsafe workplaces are different, the OSHA regulation is informative. OSHA sought to accommodate legitimate employer fears of abuse and the workers' need for protection from physical risks. Rather than allowing a worker to walk off the job whenever the working condition was unlawful,

NW2d 223 (1985), the plaintiff was an assistant administrator of a Red Cross blood center, overseeing a number of departments. When his new superior officer criticized his work and gave him the option of accepting a different Red Cross job at the same pay or resigning, he refused to do either. He was then terminated for failure to report to work. He sought damages for racial discrimination. The Court of Appeals said:

"In view of the testimony that the new position offered to plaintiff was a demotion and that his responsibilities were severely reduced after [a new executive director] arrived, we believe a reasonable factfinder could conclude that the new position was not the substantial equivalent of the position of Blood Program Administrator.

"We conclude that a finding of constructive discharge is supported by the evidence and that plaintiff was not required to accept the position offered to him. A reasonable juror could conclude that the foreseeable impact of defendants' conduct was that plaintiff's working conditions would become so difficult and unpleasant that he would be compelled to resign." *Id.* at 797-798.

[7] Discipline is barred where:

"(1) a reasonable employee believes in good faith; (2) that performing assigned work would involve a *real danger of death or serious injury;* (3) the employee was unable to obtain correction of the condition by the employer; and (4) there is *insufficient time to eliminate the danger through resort to regular statutory enforcement channels.*" Rothstein, *Occupational Safety Health,* p 219. (Emphasis supplied.)

OSHA premised the right to walk on the severity of the potential harm, "a real danger of death or serious injury," and the inability to "resort to regular statutory enforcement channels."

## C

Discrimination alone is not sufficient to justify back pay when an employee chooses not to return to work because "society and the policies underlying Title VII will be best served if, wherever possible, unlawful discrimination is attacked within the context of existing employment relationships." *Bourque, supra* at 66. The same policy analysis and reasoning should be implemented in the application of this state's comparable legislation, the source of the underlying right in the instant case.

Society benefits because discrimination may be corrected at the plant with less cost. If the employee leaves and back pay is awarded, money is paid for services not performed. Even if back pay is not ordered, the employer nevertheless must generally pay to find and train a replacement. The former employee might be unable to find employment during the legal contest and might even remain unemployed afterwards. If the employee had stayed on the job, there would have been an opportunity for communication between the parties, and greater opportunity for them to resolve their differences, and there might be less probability that they would have resorted to a lawsuit.[8]

Although it is clear that continued employment is beneficial to both employers and employees, the reasons why the employee and not the employer should ordinarily be called upon to mitigate damages during a legal contest by suffering at least

[8] See *Young v Southwestern Savings & Loan Ass'n,* 509 F2d 140 (CA 5, 1975).

temporarily a perceived injustice need to be articulated. I note at the outset that the legality of the rule or treatment being contested has usually not been determined when the controversy begins. Both sides believe they are right, and it can often be a close call. If the employee stays on despite the discriminatory condition, the employee can ordinarily be "made whole" retroactively. If the discrimination is, for example, in pay scales, the employee can be paid the difference between what was earned and what should have been earned.[9]

In the instant case, where the discrimination does not involve a pay differential, if Cornell had chosen to mitigate damages by continuing to work, she might be entitled to compensation for the mental distress caused her by wearing the discriminatory uniform.[10]

The employer cannot, however, be made whole retroactively.[11] Requiring the employer to mitigate damages by not enforcing a rule whenever an

[9] See *Muller v United States Steel Corp,* 509 F2d 923, 930 (CA 10, 1975).

[10] In *Boscaglia v Michigan Bell,* n 1 *supra* at 318, n 13, this Court said:

"Although this Court has not decisionally addressed the question, courts in other jurisdictions are divided over whether, under similar statutory language, an administrative agency may award damages for physical, mental, or emotional injuries suffered as a result of employment discrimination."

Mental distress compensation might be justified in the instant case —had Cornell continued to work—without regard to whether this Court ultimately concludes that mental distress damages are generally recoverable, because otherwise a worker who remains on the job would receive nothing for successfully challenging an unlawful discriminatory condition. Cf. *Veselenak v Smith,* 414 Mich 567, 572; 327 NW2d 261 (1982); *Valentine v General American Credit, Inc,* 420 Mich 256, 263; 362 NW2d 628 (1984). See MCL 423.307(h); MSA 17.458(7)(h) and MCL 37.2605(2)(k); MSA 3.548(605)(2)(k). If such compensation is awarded as an exception to a general rule that mental distress damages are not recoverable, this Court in formulating the exception could confide full control of the amount to the circuit court on a trial de novo.

[11] *Ford Motor Co v EEOC,* 458 US 219, 232-233; 102 S Ct 3057; 73 L Ed 2d 721 (1982).

employee considers it discriminatory or run the risk of a back-pay award would impair management's ability to manage. In large plants, the result could be disruptive.[12] Reinstating rules subsequently found not to be discriminatory would not rectify the damage to the employer.

Because the employee is generally in a better position to mitigate damages and can ordinarily be made whole retroactively more readily than the employer, the burden has been placed on the employee, not the employer, to endure, at least temporarily, an endurable perceived injustice.

### III

The plurality declares that the plaintiff did not resign; rather she was discharged.

### A

The consequence of the plurality's decision is that by labelling the facts a discharge, the employee becomes entitled to back pay without regard to whether the discriminatory condition was "so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." If the plurality had labelled the facts in the instant case a resignation, then the employee would be entitled to back pay only if the discriminatory condition was not so difficult or unpleasant. The reasons the plurality classifies this a discharge and not a resignation are not persuasive.

Sparrow did not summarily discharge Cornell when she arrived in noncomplying dress. Cornell did not submit her resignation. Rather, Sparrow

---

[12] See *Whirlpool Corp v Marshall, supra* at 17, where the United States Supreme Court commented on the impolicy of "giving employees a unilateral authority to walk off the job which they might abuse in order to intimidate or harass their employer."

sent Cornell home with instructions to change her
dress to conform to the requirements of the dress
code. The plurality has made a matter of consider-
able consequence turn on doubtful characteriza-
tion. From Sparrow's vantage point it may have
been seen as a resignation. From Cornell's vantage
point it may have been seen as a discharge.[13]
Application of the constructive-discharge analysis
should not turn on questionable characterizations
of the same facts by appellate courts.

### B

The central question is not whether a termina-
tion is classified a resignation or a discharge, but
whether an employee was justified in failing to
mitigate damages by working under the chal-
lenged discriminatory condition while pursuing
administrative and judicial remedies. This issue is
not resolved by drawing a distinction between
whether the employee quit or should be deemed to
have been fired.

The plurality appears to hold that whenever an
employer imposes a mandatory condition of em-
ployment, and the employee chooses to leave the
job rather than work under the condition, con-
structive-discharge analysis does not apply; impos-
ing the condition is deemed tantamount to actual
discharge. This is an unduly narrow interpretation
of the constructive-discharge doctrine that ignores
the case law.

Ordering an employee to wear a uniform as a
condition of continued employment does not differ
from requiring an employee to accept less pay or a
transfer as a mandatory condition of continued
employment. In *Bourque,* constructive-discharge
analysis was applied when a woman was told she
must accept less pay than a man for the same

---

[13] See *Young,* n 8 *supra* at 142.

work. *Bourque, supra* at 63-64. In *Alicea Rosado v Garcia Santiago,* 562 F2d 114, 119-120 (CA 1, 1977), *Jenkins v American Red Cross,* 141 Mich App 785, 791, 797; 369 NW2d 223 (1985), and *Frazer v KFC Nat'l Management Co,* 491 F Supp 1099 (MD Ga, 1980), constructive-discharge analysis was applied when employees were required to accept transfers to less desirable jobs as a condition of continued employment. In all these cases, "[employers] demanded unconditional surrender to the company policy." *Young v Southwestern Savings & Loan Ass'n,* 509 F2d 140, 145 (CA 5, 1975). Similarly, constructive-discharge analysis was applied in *Young* where an atheist refused to attend monthly business meetings that began with a prayer. Her supervisor had told her the meetings were mandatory. In all the cases where a constructive discharge was found, the courts could have reached the same result, ignoring constructive-discharge analysis, by simply characterizing the termination of employment as a discharge or firing.

The plurality repeatedly emphasizes that Cornell "was ready, willing, and able to work." She was ready, willing and able to work, but only on her terms. So were the employees in all the other cases. They were *willing* to work if the contested condition was removed, that is, if the pay scales were changed, *Bourque, supra,* if the transfers were withdrawn, *Rosado, supra, Jenkins, supra,* and if attendance at a prayer meeting was not required.

The statement by Cornell's supervisor, *"go home* again and change clothes," does not justify a finding of actual discharge. She was told to go home so she could change her clothes. If the uniform had been in her locker, she would have been sent to her locker to change her clothes. The circumstance that she had to go home to change her clothes is

not significant. The words "go home" added noth-
ing to the statement that she would be required to
comply with the working condition; they were
merely incidental to the statement.

The plurality also relies on the decisions of the
hearing referee and the Civil Rights Commission,
finding that an actual discharge had taken place.
As noted earlier, the circuit court characterized
the record differently, finding that "claimant chose
not to adhere to the code and thus terminated her
employment." The plurality states that in "light of
the fact-finding of the administrative tribunals and
lower courts, we accept the finding that the hospi-
tal discharged Ms. Cornell . . . ."

Article 5, section 29 of the Constitution requires
de novo review by the circuit court of the findings
of the commission. This Court has said: "Our
review on appeal is of the circuit court decision,
not that of the commission . . . ." *Dep't of Civil
Rights v Beznos,* 421 Mich 110, 117; 365 NW2d 82
(1984). The circuit judge did not find that Cornell
was discharged. He found rather that Cornell ter-
minated her own employment. He did not find
that the words "go home" meant she was dis-
charged. It was for the circuit court, not the Court
of Appeals, this Court, or the Civil Rights Commis-
sion, to find the facts. The circuit court's findings
should not be reversed unless this Court is pre-
pared to say, and it has not, that they were clearly
erroneous.

C

After concluding that constructive-discharge
analysis does not apply, the plurality says that
even if it were applied, Cornell was constructively
discharged and back pay should be awarded. The
plurality misapplies constructive-discharge analy-
sis. The plurality would hold that "[i]n light of the

obviously demeaning nature of the dress code and of her employer's unwillingness to reexamine its dress code, it was reasonable for Ms. Cornell not to return to work." In most cases where an employee resigns, the employer may be said to have been unwilling to reexamine the contested working condition. "Demeaning" working conditions themselves do not necessarily mean that the employee has been constructively discharged. Paying a woman less than a man in the same job is demeaning and discriminatory, but was found not to have been a constructive discharge in *Bourque, supra.* Discriminatory demotions and transfers are also demeaning, but were found not to have been constructive discharges in *Alicea Rosado, supra* at 119-120. Discrimination because of sex or race is generally demeaning, but discrimination alone is not sufficient to constitute a constructive discharge. *Bourque, supra; Nolan v Cleland,* 686 F2d 806, 813 (CA 9, 1982); *Clark v Marsh, supra.*

## D

The cases relied on by the plurality do not militate against application of constructive-discharge analysis on the facts of this case. *Albemarle Paper Co v Moody,* 422 US 405; 95 S Ct 2362; 45 L Ed 2d 280 (1975), as the plurality indicates, was a class action "brought on behalf of present and former black employees of the Albemarle Paper Company alleging certain violations of Title VII . . . with respect to the company's seniority system and its program of employment testing." The employees who remained working at Albemarle when the action was brought had clearly mitigated their damages. They had decided to continue working in the face of discriminatory working conditions; the back pay they were seeking was the difference between the compensation

they had received and what they would have received if there had been no discrimination. They were not asking for damages they could have mitigated by continuing to work for Albemarle.

There is no indication in *Albemarle* that the "former" employees were claiming damages they could have so mitigated. The opinion does not suggest that these were employees who lost their jobs because they had refused to work under discriminatory conditions. If any conclusion can be drawn, it is that they were employees who had retired or switched jobs, and they were seeking damages for the difference between the compensation they were paid and what they should have been paid.[14] *Albemarle* thus seems to address the back-pay question in a different context.

The only case cited by the plurality as a basis for rejecting constructive-discharge analysis does not contradict or preclude its application in the instant case. *EEOC v Sage Realty Corp,* 507 F Supp 599, 605 (SD NY, 1981), is essentially an alternative expression of the same principle. There, a woman serving as a lobby attendant was required to wear a uniform resembling an American flag. Her thighs and portions of her buttocks were exposed, and when she raised her arms, the side of her body above the waist was visible. While wearing the uniform she was "subjected to repeated harassment. She received a number of sexual propositions and endured lewd comments and gestures . . . ." When she refused to wear the outfit, an employee was sent to convince her to change, and, when she still refused, she was ordered to leave.

---

[14] *Albemarle* also seems to have involved employees who were not hired because of discriminatory employment tests or who were laid off because of discriminatory seniority practices. Neither of these groups of employees was in a position to mitigate damages by continuing to work for Albemarle. *Albemarle, supra* at 408.

The plurality concludes that *Sage Realty* shows
that where an employee is ordered to leave there
has been an actual discharge that precludes "con-
structive discharge" analysis. To be sure, the
United States District Court in *Sage Realty* did
not explicitly apply constructive-discharge analy-
sis. It did, however, reach the same result as might
have been reached in the application of construc-
tive-discharge analysis. The court noted that the
"proper question is not whether the victimized
employee resigned or was discharged, but whether
she acted reasonably in quitting rather than suf-
fering the effects of discrimination."[15] The Court
added that the plaintiff had "acted *reasonably* in
refusing to wear the Bicentennial uniform she was
issued."

A reasonable-person standard has been applied
in the constructive-discharge cases. See *Bourque*
and *Clark, supra.* The trier of fact in *Sage Realty*
could have properly found that the condition there
was "so difficult or unpleasant that a reasonable
person in the employee's shoes would have felt
compelled to resign."

## IV

The circuit court in denying back pay said:

> Although this Court has found that the Respon-
> dent's dress code was discriminatory based upon
> sex, as well as a condition of employment, these
> violations must be put in proper perspective. The
> dress code, as instituted, does not amount to such
> purposeful and invidious discrimination as to pro-
> hibit the attainment of gainful employment. This
> is not the type of discrimination that has been so
> historically rampant that denied an individual of
> any employment opportunities.

[15] *Id.* at 608, n 14.

It is apparent that the circuit court did not apply constructive-discharge analysis in deciding the back-pay issue. The question was not whether the dress code constituted "purposeful and invidious discrimination," but whether the dress code constituted a working condition "so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign."

I would remand to the circuit court for a reconsideration of the back-pay question, applying the constructive-discharge mode of analysis.