**Maryland Lucky Reynolds ROSENBLOOM,**
Plaintiff,

v.

**SENIOR RESOURCE, INC., Alice Moorman, Kathy Mosavat, and Roger Kolb, personally and as employees of Defendant Senior Resource, Inc., Defendants.**

No. 3–96 CIV 520.

United States District Court,
D. Minnesota,
Third Division.

Aug. 8, 1997.

Gant Law Office, Minneapolis, MN by Jesse Gant, III, for Plaintiff.

Oppenheimer Wolff & Donnelly, Minneapolis, MN by Kevin M. Lindsey, for Defendants.

### ORDER

ALSOP, Senior District Judge.

The above-entitled matter came on for hearing before the Court on July 17, 1997, upon the motion of defendants, Senior Resource, Inc., Alice Moorman, and Kathy Mosavat,[1] for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. Defendants seek dismissal of Rosenbloom's eight count complaint. The Court will grant Defendants' motion in its entirety.

### BACKGROUND

Defendant Senior Resource, Inc. is a social service agency that provides activities, community centers, transportation coordination, and adult daycare for seniors. Its mission is to enable seniors to live independently with dignity and purpose. To help fulfill its mission, Senior Resource operates senior centers at several locations in the Minneapolis area. One of the senior centers, Park Center, is located in downtown Minneapolis and is attached to a high rise apartment building. The Minneapolis Public Housing Authority owns both Park Center and the apartment building.

Several other social service agencies, including Volunteers of America ("VOA"), are also located at Park Center. VOA provides congregate meal dining to needy individuals within Hennepin County. VOA is not affiliated with Senior Resource, although VOA and Senior Resource are both located at Park Center and may serve the same clients.

On October 31, 1994, Senior Resource hired the Plaintiff, Maryland Lucky Reynolds Rosenbloom, as a program coordinator at Park Center. Rosenbloom is an African-American male. Defendant Alice Moorman was Rosenbloom's immediate supervisor at Park Center. Moorman was subsequently replaced by Defendant Kathy Mosavat. Both Moorman and Mosavat reported to Beth Zemek.

Roger Kolb "hung out" at Park Center, but was not a client of Senior Resource. There is some evidence in the record that Kolb occasionally volunteered with VOA by serving meals, but VOA has no record of him volunteering. He was not an employee of Senior Resource, nor did he volunteer for Senior Resource.

On December 9, 1994, Kolb approached Rosenbloom in Park Center and stated "fucking nigger, I'm going to kill you." Rosenbloom had done nothing to provoke this comment. Several bystanders intervened and Kolb was asked to leave Park Center. Following this incident, Rosenbloom submitted a memo to Moorman stating that he had been subjected to racist comments in the past by clients of Senior Resource and that he did not want Kolb allowed back into Park Center.

On December 12, 1994, Kolb returned to Park Center, but was not encountered by Rosenbloom. Another Senior Resource em-

---

1. Roger Kolb's location is unknown and he has never been served with Rosenbloom's complaint. Therefore, the Court will dismiss him from the action.

ployee escorted him off the premises. On the same day, Rosenbloom wrote Moorman a second memo stating that he felt her response to the incident on December 9 had been inadequate. In particular, Rosenbloom was upset because Moorman suggested that he approach Kolb, apologize, and try to "talk it out."

Moorman discussed the incident with her supervisor, Beth Zemek. The two apparently disagreed regarding how Senior Resource should respond. On December 13, 1994, Zemek ordered Moorman to issue a memo stating that Kolb was not to be allowed into Park Center and that employees should immediately call the police if Kolb returned. In addition, Senior Resource distributed anti-racism posters and notices that racism was not acceptable at Park Center.

On December 16, 1994, Kolb returned once again to Park Center. During this incident, Kolb intentionally bumped into Rosenbloom as he entered the doorway of Moorman's office and called Rosenbloom a "lying Black Christian." Rosenbloom suffered no cut, bruise or bleeding as a result of the bump. Kolb and Moorman then remained in Moorman's office for approximately 20 minutes. Moorman eventually escorted Kolb out of Park Center. Rosenbloom was on the phone with Zemek during the incident and complained that Moorman had not had Kolb removed from Park Center immediately.

After the incident on December 16, Zemek contacted the Minneapolis Housing Authority to request that a restraining order be issued against Kolb. A restraining order was issued and Kolb has not been seen in Park Center since. However, on March 23, 1995, Rosenbloom received a racist telephone call from an unidentified man who may have been Kolb. Shortly after receiving the phone call, Rosenbloom contacted Zemek. Zemek informed Rosenbloom that she would make a report to the police and extend the restraining order.

In late December of 1994, in part because of her failure to immediately remove Kolb from Park Center on December 16, Moorman was removed as the Director of Park Center.

Moorman was replaced by Mosavat. At a staff meeting in January of 1995, Mosavat told Rosenbloom "I don't give a damn what you think," when he raised concerns regarding the harassment by Kolb at an inconvenient time. Mosavat later apologized for the comment.

On March 21, 1995, one of Rosenbloom's co-workers, Mary Speranza–Reeder, complained to Mosavat of sexual harassment by Rosenbloom based upon an allegedly sexist comment. On or about March 24, Mosavat met privately with Rosenbloom regarding Speranza–Reeder's complaint. Rosenbloom admitting making a comment regarding what constitutes women's work or that women have more difficulty making up their minds than men, but claimed the comment did not constitute sexual harassment. Mosavat told Rosenbloom that his comment could be construed as sexist, but that no adverse action would be taken. The issue was never again raised by Senior Resource.

On March 30, Rosenbloom took a month of medical leave due to stress. On the same day, Rosenbloom wrote Zemek a memo regarding incidents of racism he encountered at Park Center. Some of the Senior Resource clients called Rosenbloom nigger, Sambo, and zebra[2] In addition, Senior Resource staff members found these terms written on tables in Park Center. Such comments occurred throughout Rosenbloom's employment by Senior Resource, although they became worse after Rosenbloom planned an African–American cultural celebration. The comments were apparently fueled by Caucasian clients' fears that minority clients of Senior Resource would "take over." Senior Resource had historically encountered difficulty encouraging diversity at Park Center. Although Senior Resource discussed the problem at staff meetings, at least some employees felt that little was done in the form of policies or clear direction to prevent racism from occurring at Park Center.

On April 7, 1995, Rosenbloom filed a charge of race discrimination with the Minneapolis Civil Rights Department alleging that he had been subjected to a racial hostile

---

**2.** Zebra is a racist term used to describe a person in an interracial marriage.

work environment and suggesting that the sexual harassment complaint was being used to "set him up" for termination. Rosenbloom also claimed that Senior Resource ignored his complaints regarding racist *comments* by clients.

On June 16, 1995, after returning to work, Rosenbloom requested to work more hours.[3] Senior Resource could not accommodate Rosenbloom's request. Rosenbloom eventually failed to show up for work. Finally, on June 22, 1995, Rosenbloom resigned from Senior Resource. In his resignation letter, he claimed Senior Resource had constructively discharged him.

Rosenbloom's discrimination charge was dismissed by the Minneapolis Civil Rights Department on May 6, 1996 after Rosenbloom voluntarily withdrew his charge with the intention of pursuing a private cause of action. On May 21, 1996, Rosenbloom filed a complaint in state court. Senior Resource removed the case to Federal Court on June 7, 1996. On October 25, 1996, Rosenbloom filed an amended complaint. His amended complaint alleges eight claims: Count I, Race Discrimination and Harassment under Title VII and the Minnesota Human Rights Act ("MHRA"); Count II, Aiding and Abetting Race Discrimination under the MHRA; Count III, Negligent Retention; Count IV, Negligent Supervision; Count V, Constructive Discharge; Count VI, Assault; Count VII, Battery; and Count VIII, Defamation.

## STANDARD FOR SUMMARY JUDGMENT

The Supreme Court has held summary judgment is to be used as a tool to isolate and dispose of claims or defenses that are either factually unsupported or based on undisputed facts. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–24, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986); *Hegg v. United States,* 817 F.2d 1328, 1331 (8th Cir.1987). Summary judgment is proper, however, only if examination of the evidence in a light most favorable to the non-moving party reveals no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.,* 477

U.S. 242, 247, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986).

The test for whether there is a genuine issue of material fact is two-fold. First, the materiality of a fact is determined from the substantive law governing the claim. Only disputes over facts that might affect the outcome of the suit are relevant on summary judgment. *Liberty Lobby,* 477 U.S. at 252, 106 S.Ct. at 2512; *Lomar Wholesale Grocery, Inc. v. Dieter's Gourmet Foods, Inc.,* 824 F.2d 582, 585 (8th Cir.1987), *cert. denied,* 484 U.S. 1010, 108 S.Ct. 707, 98 L.Ed.2d 658 (1988). Second, any dispute of material fact must be "genuine." A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party. *Liberty Lobby,* 477 U.S. at 252, 106 S.Ct. at 2512. It is the non-moving party's burden to demonstrate there is evidence to support each essential element of the claim. *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553.

## DISCUSSION

### A. Race Discrimination—Count I

Count I of Rosenbloom's complaint alleges that he was subject to a racial hostile work environment and constructively discharged due to: 1) the incidents with Kolb in December of 1994; and 2) the racial slurs used by clients of Senior Resource. Rosenbloom claims Senior Resource is liable for these actions based on several theories. First, Rosenbloom argues Kolb was a Senior Resource volunteer and therefore an agent of Senior Resource. Next, Rosenbloom suggests Moorman and Mosavat had a duty to respond to the racist behavior by Kolb and other clients, and by failing to respond, ratified the racism. The Court will address each of these theories in turn.

■ Rosenbloom's claim that Kolb was a Senior Resource volunteer or agent fails. Taking the evidence in the light most favorable to Rosenbloom, the record shows Kolb volunteered by serving meals with VOA. There is no evidence Kolb volunteered with Senior Resource. Although VOA and Senior Resource are both located at Park Center, it

---

**3.** Rosenbloom had also requested additional hours on January 31 and February 13.

is undisputed that VOA and Senior Resource are two separate entities. Therefore, even if Kolb was a VOA volunteer, he was not an agent of Senior Resource. This is true even if Senior Resource had the power, as it apparently did, to have Kolb removed from Park Center.[4]

◼ Rosenbloom's second theory of liability raises an interesting and difficult question of first impression within the Eighth Circuit and possibly the Federal Courts. Rosenbloom suggests that an employer may be liable for acts of third parties that create a racial hostile work environment if the employer fails to take steps to remedy the harassment once it becomes known to the employer. Rosenbloom argues that by failing to keep Kolb from returning to Park Center, and by not instituting a policy to deal with racial slurs, Senior Resource ratified the racist behavior.

The parties and the Court have failed to find any case law where an employer has been held liable for the racial harassment of an employee by a third party.[5] In the context of sexual harassment, however, several courts have ruled that an employer may be liable for a sexual hostile work environment when the employer knows of the harassing conduct and fails to take steps to remedy the harassment. See. e.g. Powell v. Las Vegas Hilton Corp., 841 F.Supp. 1024 (D.Nev.1992); Magnuson v. Peak Technical Servs., Inc., 808 F.Supp. 500 (E.D.Va.1992); EEOC v. Sage Realty Corp., 507 F.Supp. 599, 609–10 (S.D.N.Y.1981); see also David S. Warner, Note, Third–Party Sexual Harassment in the Workplace: An examination of Client Control, 12 Hofstra Lab. L.J. 361, 363 (1995). Commentators have noted that such liability is a novel expansion of traditional views of Title VII and the Supreme Court has "implicitly warned against unsubstantiated judicial extensions of employer liability not contemplated within the Civil Rights Act of 1964." Id. at 392 n. 102 (citing Meritor

Savings Bank, FSB v. Vinson, 477 U.S. 57, 72, 106 S.Ct. 2399, 2408, 91 L.Ed.2d 49 (1986)). The Eighth Circuit has apparently never extended an employer's liability in this manner.

Most cases creating employer liability for third-party sexual harassment involve one of two circumstances. In the first, an employee is placed in a situation where the third-party exercises "control" over the employee. See, e.g., Magnuson, 808 F.Supp. at 507–11; Otis v. Wyse, 1994 WL 566943 (D.Kan.1994). For example, a temporary agency may be sued by the employee it placed into a sexual hostile work environment. In such cases, both the employer and the business using the employee's services exercise control over the employee. Thus, assuming other conditions are met, liability may be extended to the employer. In the second typical case, an employer imposes a policy or dress code upon an employee which makes the employee's "acquiescence in sexual harassment by the public ... a prerequisite of her employment." EEOC v. Sage Realty Corp., 507 F.Supp. 599, 609–10 (S.D.N.Y.1981); see also EEOC v. Newtown Inn Assocs., 647 F.Supp. 957 (E.D.Va.1986) (sexual harassment by patrons as result of dress code and employer's policy that waitresses flirt with customers); State by Beaulieu v. RSJ, Inc., 552 N.W.2d 695 (Minn.1996) (restaurant owner stated he was "trying to sell legs"). However, several courts have gone beyond these two categories of cases and suggest that employers have a broad duty to protect their employees from sexual harassment, even when an employer does not directly benefit from the harassment. See Henson v. City of Dundee, 682 F.2d 897 (11th Cir.1982); Whitaker v. Carney, 778 F.2d 216 (5th Cir.1985), cert. denied, 479 U.S. 813, 107 S.Ct. 64, 93 L.Ed.2d 23 (1986); Powell v. Las Vegas Hilton Corp., 841 F.Supp. 1024 (D.Nev.1992).

Just as in sexual hostile work environment cases, there may be circumstances where an

---

4. Rosenbloom does not argue that the Senior Resource clients that made racist statements are employees.

5. The Equal Employment Opportunity Commission considers an employer responsible for the acts of non-employees with respect to harass-

ment of employees based upon race. 29 C.F.R. § 1606.8(e). The key factor in the EEOC's determination is whether the employer may exercise control over the third party. Id. The EEOC's ruling, however, is not determinative.

employer can be held liable for the racial hostile work environment created by a third party. In this case, however, there is no evidence Senior Resource benefitted from Kolb's disruptive behavior or from the racist slurs by its clients. In fact, the record shows Senior Resource was concerned about both incidents and, in at least one case, took rapid measures to remedy the situation.[6] Although it is disappointing that Senior Resource did not respond more rapidly to the racist slurs by its clients, there are no facts suggesting that Senior Resource ratified or condoned the comments as Rosenbloom charges. Furthermore, Senior Resource took steps to educate its clients by posting notices and posters regarding racism.

By so ruling, the Court does not intend to minimize Kolb's behavior or the racist statements. No individual should have to tolerate the comments and threats directed at Rosenbloom. Federal law, however, does not hold an employer liable in all circumstances for a third party's discriminatory behavior.

■ Finally, there is no evidence Rosenbloom was constructively discharged by Senior Resource. "A constructive discharge occurs when an employee resigns in order to escape intolerable working conditions caused by illegal discrimination." *Continental Can Co., v. State,* 297 N.W.2d 241, 251 (Minn. 1980) (citations omitted). The record in this action does not support Rosenbloom's claim. In addition, six days before Rosenbloom resigned, he asked to work additional hours.

This strongly suggests Rosenbloom did not find the workplace "intolerable." The fact Rosenbloom claimed in his resignation letter that he was constructively discharged does not make it so. Accordingly, this claim will be dismissed.

## B. Aiding and Abetting—Count II

Count II of Rosenbloom's complaint alleges that Moorman and Mosavat aided and abetted the discriminatory and harassing practices described in Count I in violation of the MHRA. As an initial matter, because the Court has rejected the claim of discrimination in Count I, Rosenbloom's claim of aiding and abetting must also fail. *See Zelewski v. American Fed. Savings Bank,* 811 F.Supp. 456, 462 (D.Minn.1993). However, even if Rosenbloom's claims of harassment and discrimination in Count I had survived summary judgment, the Court would dismiss Rosenbloom's aiding and abetting claim because it is barred by the statute of limitations.[7]

Minnesota Statute § 363.03, subd. 6 states that "[i]t is an unfair discriminatory practice for any person ... intentionally to aid, abet, incite, compel, or coerce a person to engage in any of the practices forbidden by this chapter." The MHRA requires that claims of discriminatory practices be brought or filed "within one year after the occurrence of the practice." Minn.Stat. § 363.06, subd. 3. Rosenbloom, however, did not name Moorman or Mosavat in his Minneapolis Human Rights Department Charge. Rosenbloom's

---

**6.** Although it is not necessary for the Court to rule on this argument, Senior Resource also claims it took adequate remedial measures after learning of the Kolb incident The Court agrees that the evidence shows Senior Resource acted promptly and appropriately in investigating the incident, issuing an memo barring Kolb from Park Center, and responding when Kolb returned to Park Center. It is true Moorman did not immediately have Kolb removed from the premises when he appeared at Park Center on December 16, but Senior Resource's overall response was timely. Moorman's actions were insensitive given the gravity of Kolb's threat to Rosenbloom, but that was the only other time Rosenbloom saw Kolb after the initial altercation. The law does not require an employer to take all steps requested by an employee—the employer is only required to take prompt and adequate measures to remedy the situation. Senior Resource met this standard.

**7.** Assuming a duty to protect employees from harassment and discrimination by third parties did exist, a supervisor's failure to fulfill this duty may constitute "tacit assent" to a perpetrator's conduct and create aiding and abetting liability. *See Smith v. Hennepin Technical Center,* 1988 WL 53400, *17 (D.Minn.1988) (in the context of sexual harassment). The facts of *Smith,* however, are egregious. Hennepin Technical Center knew of the sexual harassment for years and numbers of female students filed complaints before administrators took any steps to remedy the situation. In addition, the administrators discouraged complaints and failed to follow the school's publicized grievance procedure. In this case, there is no evidence suggesting that Moorman and Mosavat tacitly assented to the racist statements by Kolb and other Senior Resource clients.

complaint was filed on May 21, 1996. The incidents Rosenbloom bases Count II upon occurred prior to May 21, 1995. Thus, the claims against Moorman and Mosavat are untimely. *See Zelewski*, 811 F.Supp. at 460; *State by Beaulieu v. RSJ, Inc.*, 552 N.W.2d 695, 699–700 (Minn.1996).

## C. Negligent Retention and Supervision—Counts III & IV

Rosenbloom claims Senior Resource negligently retained and supervised Kolb, Moorman, and Mosavat. The doctrine of negligent retention "arose out of the common law fellow-servant law which imposed a duty on employers to select employees who would not endanger fellow employees by their presence on the job." *Ponticas v. K.M.S. Invs.*, 331 N.W.2d 907, 910 (Minn.1983). The employer's liability is based on its negligence in placing a person with known propensities, or propensities which should have been discovered, in a position in which the hired individual reasonably posed a threat of physical injury to other employees. *See Mandy v. Minnesota Min. and Mfg.*, 940 F.Supp. 1463, 1470–71 (D.Minn.1996); *Kresko v. Rulli*, 432 N.W.2d 764, 769 (Minn.Ct.App.1988). Courts applying Minnesota law have held that a claim for negligent retention must be based upon an intentional tort or harassment that results in physical injury or a threat of physical injury. *See Bruchas v. Preventive Care. Inc.*, 553 N.W.2d 440, 443 (Minn.Ct.App. 1996); *Oslin v. State*, 543 N.W.2d 408, 415 (Minn.Ct.App.1996). Claims for negligent retention invariably arise outside the scope of the tortfeasor or harasser's employment. *See, e.g., Leidig v. Honeywell, Inc.*, 850 F.Supp. 796, 807 (D.Minn.1994).

Unlike negligent retention which imposes direct liability upon an employer, liability for negligent supervision is imposed upon an employer under a theory of respondeat superior. The basis of liability for negligent supervision is that the tortious act is committed within the scope of employment. *See Oslin*, 543 N.W.2d at 414. As in negligent retention, physical injury or a threat of physical injury is necessary to allege a claim for negligent supervision. *See, e.g. Semrad v. Edina Realty, Inc.*, 493 N.W.2d 528, 533–34 (Minn.1992); *Bruchas*, 553 N.W.2d at 443.

Although the definition of "physical injury" is unclear, this District has held that it is not necessary to allege an act of violent aggression to state a claim for negligent supervision or retention. *See Mandy*, 940 F.Supp. at 1472.

As discussed above, Kolb was neither a volunteer or employee of Senior Resource. Thus, Senior Resource cannot be liable for Kolb's actions under either of these doctrines. To the extent Rosenbloom asserts that Senior Resource negligently retained or supervised Moorman and Mosavat, neither Moorman nor Mosavat committed a tort against Rosenbloom. In addition, neither Moorman nor Mosavat posed a threat of physical injury to Rosenbloom, and Rosenbloom did not suffer a physical injury of the type necessary to support a negligent retention or supervision claim. Accordingly, the facts alleged by Rosenbloom cannot support a claim for negligent retention or supervision and both claims will be dismissed.

## D. Constructive Discharge—Count V

Constructive discharge is not an actual claim, but is simply an adverse employment action supporting an underlying claim of discrimination. Thus, the Court will dismiss Count V, recognizing that Rosenbloom's claim of constructive discharge is correctly analyzed as a portion of Count I.

## E. Assault and Battery—Counts VI & VII

Rosenbloom asserts that Kolb committed an assault and battery against him when Kolb pushed Rosenbloom into the door frame, and that Senior Resource is liable for Kolb's actions. As discussed above, Senior Resource was not Kolb's employer or principal, and is not, therefore, vicariously liable for Kolb's actions. Accordingly, Counts VI and VII will be dismissed.

## F. Defamation—Count VIII

Count VIII of Rosenbloom's complaint alleges that Senior Resource defamed him when it questioned him regarding the sexual harassment complaint filed by Speranza–Reeder. The Court disagrees.

To state a claim for defamation under Minnesota law, a plaintiff must show: 1)

a statement; 2) communicated to someone other than the plaintiff; 3) which is false; and 4) that tends to harm the plaintiff's reputation in the community. *See Stuempges v. Parke, Davis & Co.*, 297 N.W.2d 252, 255 (Minn.1980) (citations omitted). Rosenbloom fails to show that the statement he alleges was defamatory was published to someone else or is false. In addition, a qualified privilege exists because the statement was made in the course of an employer's investigation of possible employee misconduct.

Rosenbloom's defamation claim borders on the frivolous. First, Senior Resource never published the sexual harassment complaint. Mosavat simply discussed Speranza–Reeder's complaint of offensive conduct with Rosenbloom, the person against whom the complaint was made. Even if Senior Resource had published the sexual harassment complaint, such a complaint had in fact been made and the statements made by Mosavat regarding a sexual harassment complaint were true. Rosenbloom also admits that the content of the complaint was true, and that he did make the statements attributed to him by Speranza–Reeder. Therefore, Rosenbloom has failed to show the statements made by Mosavat were false.

Rosenbloom has presented no evidence showing that the sexual harassment complaint was made in retaliation for Rosenbloom raising concerns regarding race discrimination. The complaint was made by Speranza–Reeder, a co-worker of Rosenbloom. There is no evidence it was instigated by Mosavat, nor is there evidence Mosavat's reaction to Speranza–Reeder's complaint was stronger because it named Rosenbloom. In fact, with the exception of discussing the complaint with Mosavat, Rosenbloom was not subject to any adverse employment action because of Speranza–Reeder's complaint.

Finally, Minnesota Court's have ruled that an employer has a qualified privilege to discuss with its employees instances of possible misconduct. The Minnesota Supreme Court has held:

> Communications between an employer's agents made in the course of investigating or punishing employee misconduct are made upon a proper occasion and for a proper purpose, as the employer has an important interest in protecting itself and the public against dishonest or otherwise harmful employees.

*McBride v. Sears Roebuck & Co.*, 306 Minn. 93, 235 N.W.2d 371, 374 (1975). So long as a statement is "made upon a proper occasion, from a proper motive, and [is] based upon reasonable or probably cause ... actual malice must be proved." *Stuempges v. Parke, Davis & Co.*, 297 N.W.2d 252, 256–57 (Minn. 1980). Nothing in the record implies that Senior Resource discussed Speranza–Reeder's complaint with Rosenbloom out of actual malice.

While reasonable minds may differ as to whether the comments made by Rosenbloom constitute sexual harassment, Mosavat had a responsibility to investigate Speranza–Reeder's complaint. Mosavat properly fulfilled that responsibility. Count VIII, therefore, will be dismissed.

Accordingly, upon review of the files, motions, and proceedings herein,

**IT IS HEREBY ORDERED** That Defendants' motion for summary judgment is GRANTED and Plaintiff's complaint is DISMISSED.